**Evan A. Schmutz (3860)**
  *eschmutz@djplaw.com*
**Jordan K. Cameron (12051)**
  *jcameron@djplaw.com*
**DURHAM JONES & PINEGAR, P.C.**
3301 N Thanksgiving Way, Suite 400
Lehi, Utah 84043
Telephone: (801) 375-6600
Fax: (801) 375-3865

Attorneys for Plaintiff XMission, L.C.

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>Plaintiff,<br><br>vs.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>Defendants. | **DECLARATION OF<br>PETER L. ASHDOWN**<br><br><br><br>Case No.: 2:15cv00277 TC<br><br>Judge Tena Campbell |

I, Peter L. Ashdown, being first duly sworn and having personal knowledge of the matters asserted herein, do hereby declare as follows:

1. I am the founder of XMission, L.C.

2. I am currently the Chief Technical Officer and President of XMission.

3. I founded XMission in 1993 as Utah's first Internet Service Provider ("ISP").

4. From its early days as a private, Utah ISP, to its current role as a global business Internet provider, XMission has expanded its technical offerings to include sophisticated cloud hosting, web hosting, e-mail service and hosting, collaboration tools, business VoIP phone

service, and high speed internet connectivity solutions including optical Ethernet, copper and fiber.

5. Throughout its history, XMission has also worked with hundreds of Utah's nonprofit organizations by providing free web hosting services, and by sponsoring a variety of community-based events and facilities.

6. XMission is a widely known and well-recognized ISP in Utah.

7. In cooperation with Salt Lake City government, XMission provides free WiFi to the downtown Salt Lake City metropolitan area.

8. XMission currently has 37 employees.

9. XMission owns all the servers, routers, and switches on its network through which it hosts and provides its Internet access services for its customers.

10. XMission has an expansive network and infrastructure, which it has had to consistently update, upgrade and augment in order to combat ongoing SPAM problems.

11. XMission is the sole owner of all its hardware, and has complete and uninhibited access to, and sole physical control over, the hardware.

12. XMission provides Internet access services to both commercial and residential customers.

13. The e-mail accounts hosted and served by XMission include e-mail accounts owned by third-party customers of XMission, e-mail accounts owned by employees and/or customers of XMission's third-party customers, e-mail accounts owned by employees of XMission, and also e-mail accounts owned by XMission itself.

SLC_2178600

14. XMission's network consists of approximately 65,000 mail accounts with 12,400 billable entities.

15. Throughout its business history, XMission has expended well in excess of $3,000,000 in hardware acquisition, maintenance and related expenses to increase capacity to deal with increased SPAM and related harm, SPAM filtering expenses, and employee time in dealing with problems caused by its receipt of SPAM generally.

16. XMission expends approximately $100,000 to $200,000 per year in dealing with SPAM related issues and associated employee time, exclusive of attorney fees.

17. XMission has two full-time employees whose primary responsibilities are to deal with SPAM related issues, including, adjust filtering, responding to customer complaints, addressing blacklist issues, and acting as first responders to data security breaches, and hardware issues caused by SPAM.

18. XMission also employs 14 other technicians who dedicate at least part of their time to dealing with the aforementioned SPAM issues.

19. XMission currently has 13 servers dedicated specifically to process SPAM. Those servers could be dedicated to providing XMisson's internet access services if it were not for the SPAM. XMission has had more total spam-mitigation servers over its history.

20. I estimate that SPAM takes up 13% of all general technical support staff and 39% of mail administrative time.

21. Daily between 40% and 85% of the e-mail messages that XMission receives on its system are SPAM e-mails, of which the subject e-mails are a part. Historically we can estimate an average spam level of 60% of all e-mail hitting XMission systems.

3

22. This number would be significantly higher if not for all the precautions that XMission has taken, including subscribing to leading anti-spam services, including blacklists such as URIBL and Spamhaus, in addition to creating customized and proprietary filtering rules and e-mail server configurations utilizing tools such as SpamAssassin.

23. For each e-mail at issue in the lawsuit, XMission had to expend man hours and work to identify the source, to examine the transmission information, to examine and analyze the header information, to take efforts to determine how and why the specific e-mails were able to circumvent and/or bypass preliminary filtering techniques, and to ultimately attempt to make the e-mails stop.

24. In summary, the harm XMission suffered, and continues to suffer, as result of the ongoing SPAM problem, is manifested in financial expense and burden significant to XMission; lost employee time; lost profitability; the necessity to purchase and dedicate equipment specifically to process SPAM that could otherwise be dedicated providing internet access services; harm to reputation; harm to XMission's goodwill; and customer and e-mail recipient complaints.

25. In my capacity as Chief Technical Officer, I oversee XMission's analysis and maintenance of data related to XMission's receipt of e-mail transmissions.

26. When any e-mail arrives on XMission's servers, it is assigned a Control ID number in the ordinary course of business.

27. XMission uses this Control ID number to keep track of e-mails and for convenience in creating summaries of data.

28. Regarding commercial SPAM e-mail, the e-mails will arrive on XMission's servers with hyperlinks intended to direct the recipient of the e-mail to a specific website, commonly known as a landing page.

29. The landing page typically is a website from which the e-mail recipient can purchase the product or service advertised in the e-mail.

30. Sometimes SPAM e-mails will serve other purposes, such as tracking valid recipient e-mail addresses or wanting an email response, such as those in phishing scams.

31. The links included in the e-mails are commonly known in the industry as redirect links.

32. A redirect link is not a direct path to a specific landing page, but rather consists of a series of links used by marketers and e-mail publishers to track e-mails for a variety of purposes, including cost-per-click compensation, marketing analytics, to name a few.

33. Each of the e-mails in question contains redirect links through which Adknowledge is identified as the responsible transmitting party. Specifically, the redirect links include trackers owned by Adknowledge, including: adknowledge.com and adki.com.

34. As part of my job responsibility, I oversaw the development and implementation of a mechanism whereby customers can lodge complaints to XMission related to SPAM e-mails they receive.

35. When XMission receives customer complaints about SPAM e-mails, we will analyze the e-mail data to see if we can identify the source of the SPAM e-mails.

36. In this case, we were able to group all Adknowledge e-mails together by the trackers that Adknowledge includes in the redirect links.

37. XMission has recorded and preserved all of the original redirect paths included in the original e-mails at issue in this lawsuit on its servers.

38. Exhibit 1 hereto, is a sampling of redirect links in the actual e-mails in question. The complete redirect report is 8,459 pages long. XMission can provide it upon request from the Court.

39. XMission's Terms of Service provide that "XMission may take action on [customers'] behalf to mitigate SPAM and [customers] grant to XMission the authority and right to opt-out and/or unsubscribe from receiving any and all SPAM e-mails, sent by any party to your e-mail address(es)." *See Terms of Service*, ¶ 24, included herewith as Exhibit 2.

40. Pursuant to its Terms of Service XMission attempts, through automated means and otherwise, to click on all available opt-out links whenever a SPAM e-mail arrives on its servers.

41. XMission has attempted to click on available unsubscribe links in each of the received Adknowledge e-mails, but such does not appear to have had any significant effect as the e-mails continue on a daily basis. From this exercise, XMission has concluded that the majority of the unsubscribe links do not permit the recipient to simply click the link in order to opt-out or require that the recipient take additional steps in order to actually opt-out.

42. On April 20, 2015, XMission filed a Complaint against Adknowledge for violations of 15 U.S.C. § 7701 et seq., otherwise known as the CAN-SPAM Act. Through the date of the Complaint, Adknowledge had transmitted approximately 61,391 SPAM e-mails to XMission.

6

43. Since XMission filed its Complaint, Adknowledge has continued to transmit SPAM e-mails.

44. XMission has received approximately 64,286 SPAM e-mails from Adknowledge from January 8, 2015 through April 27, 2015.

45. Each of the e-mails is a commercial message and contains commercial content.

46. Each of the e-mails was received by XMission on its mail servers located in Utah. XMission can provide complete copies of each of the 64,286 e-mails upon request from the Court. The Exhibits to this Declaration summarize the data and information contained in those e-mails.

47. The Adknowledge e-mails that XMission has received between January 8, 2015 and April 27, 2015, have resulted in 6,646 customer complaints.

48. As of the date of this Motion, the e-mails are continuing on a daily basis, and XMission continues to receive customer complaints associated with the e-mails.

49. One of XMission's competitive advantages is that is has historically been able to offer and Internet access and business hosting services with greatly reduced SPAM traffic.

50. However, in recent years, as the number of SPAM e-mails has increased, the number of e-mails that are bypassing XMission's SPAM filtering techniques has continued to grow.

51. These e-mails include the e-mails at issue in this lawsuit.

52. In addition to specific customer complaints related to the Adknowledge e-mails, XMission's reputation and competitive advantage has been harmed, and will continue to be harmed, because customers have taken notice of the growing number of SPAM e-mails reaching

their inboxes, and have expressed dissatisfaction with XMission and doubt as to XMission's ability to offer a SPAM free service.

53. If the e-mailing is allowed to persist, it will result in possible loss of customers, and a significant, and likely irreparable, damage to XMission's reputation and competitive advantage in the market place.

54. XMission also analyzes the header information and other transmission data in the e-mails.

55. Approximately 15,362 of the e-mails received through April 27, 2015, contained header information that included inaccurate sender IP addresses. These are IP addresses that either do not belong to the identified sender domain, were not recognized by a legitimate Domain Name Service as belonging to the identified sender domain, and/or do not identify the actual source of the e-mail.

56. XMission identified this information by performing a reverse DNS lookup when the e-mails were received on XMission's servers, and logged the results in the ordinary course of business.

57. <u>Exhibit 3</u> hereto is a summary of data which includes a list of e-mails, identified by Control ID number, that contain a false or inaccurate IP address in the header information. XMission maintains all of the e-mail and data used to create this summary on its servers and can produce it if the Court so requests.

58. Approximately 16,473 of the e-mails received through April 27, 2015, contained generic "from" names and originated from privacy-protected sender domains.

59. XMission identified this information by analyzing the "from" name designated by the transmitting party and by performing a WHOIS look-up in publicly available WHOIS database, to gather privacy information on the sender domain.

60. The WHOIS database is an online repository of information associated with registered domain names. It stores and publicly displays domain name information, such creation and expiration dates, the registrar of record, and its various contacts (registrant, billing, administrative, and technical).

61. The sender domain is the e-mail domain (e.g @example.com) that was identified as the e-mail domain from which the e-mail was sent.

62. <u>Exhibit 4</u> hereto is a summary of data which includes a list of e-mails, identified by Control ID number, an identification of the generic "from" name, and an identification of the privacy protected sender domain. XMission maintains all of the e-mail and data used to create this summary on its servers and can produce it if the Court so requests.

63. Approximately 364 e-mails received through April 27, 2015, included a "from" name that identifies, at least in part, the intended recipient as the sender of the e-mail.

64. XMission identified this information by analyzing the "from" name in the e-mail header information and comparing it to the name of the intended recipient of the e-mail.

65. <u>Exhibit 5</u> hereto is a summary of data which includes a list of e-mails, identified by Control ID number, that contain a deceptive "from" name that included the name of the intended recipient. XMission maintains all of the e-mail and data used to create this summary on its servers and can produce it if the Court so requests.

66. Approximately 62,861 of the e-mails received through April 27, 2015, originated from sender domains registered with ICANN compliant domain registrars who maintain anti-spam policies.

67. XMission gathered this information by identifying the domain registrar information for each sender domain in publicly available WHOIS databases.

68. Through its research, XMission has determined that e-mails were sent from sender domains registered with: 1&1 Internet AG; BigRock Solutions, Ltd.; Crazy Domains FZ-LL; DomainSite, Inc.; eName Technology Co., Ltd.; eNom, Inc.; GoDaddy.com; Internet.bs Corp.; Key-Systems GmBh.; MarkMonitor Inc.; Moniker Online Services, Inc.; Name.com, Inc.; NameCheap, Inc.; Network Solutions, LLC; PDR Ltd. d/b/a PublicDomainRegistry.com; Register.com; TurnCommercs, Inc. d/b/a NameBright.com; Spot Domains; and, Wild West Domains, LLC.

69. Each of these domain registrars maintains anti-spam policies.

70. Each of the anti-spam policies is available to the public online.

71. 1 &1 Internet AG's *General Terms & Conditions* is located online at http://www.1and1.com/Gtc?__lf=Static&linkOrigin=&linkId=ft.nav.tandc.

   a. I accessed and downloaded the *General Terms & Conditions* from its website and include it as <u>Exhibit 6</u>, hereto.

   b. The *General Terms & Conditions* require registrants to "agree and warrant that [they] shall not use any form of mass unsolicited electronic mail solicitations . . . or any other form of 'spamming' . . . ." Section 8.14. Additionally the *General Terms & Conditions* further require that registrants "Agree and warrant that [they]

10

SLC_2178600

shall not engage in any false, deceptive or fraudulent activities . . . ." Section 8.15.

72. BigRock Solutions, Ltd.'s *Domain Registrant Agreement* is located online at http://www.bigrock.com/legal/?requestfor=registraragreement&from=agree_page.

   a. I accessed and downloaded the *Domain Registrant Agreement* from its website and include it as Exhibit 7, hereto.

   b. The *Domain Registrant Agreement* requires the registering party to agree that it will not use the services for: "sending unsolicited mass e-mails (i.e., to more than 10 individuals, generally referred to as spamming) which provokes complaints from any of the recipients; or engaging in spamming from any provider." Appx. A(2)(3); "transmitting Unsolicited Commercial e-mail (UCE)" Appx. A(2)(9)(1); "transmitting bulk e-mail" (Appx. A(2)(9)(2)).

73. Crazy Domains FZ-LLC's *Terms of Service* is located online at http://www.crazydomains.com/privacy/terms-of-service.

   a. I accessed and downloaded the *Terms of Service* from its website and include it as Exhibit 8, hereto.

   b. The *Terms of Service* refers to SPAM as the "distribution of unsolicited bulk and/or commercial electronic messages over the Internet." Section 1. Its *Terms of Service* further states "It is not acceptable to use our Service(s) for the following non-exhaustive examples and you irrevocably agree that you will not use our Service(s) to: . . . 'Spam' or engage in 'spamming' activities, or sending unsolicited commercial activities . . . ." Section 2.

SLC_2178600

74. DomainSite, Inc. d/b/a Spot Domains's *Domain Name Registration Agreement* is located online at https://www.domainsite.com/policies/registration-agreement.php.

   a. I accessed and downloaded the *Domain Name Registration Agreement* from its website and include it as <u>Exhibit 9</u>, hereto.

   b. The *Domain Name Registration Agreement* prohibits "the transmission of unsolicited email" Section 6.a.

75. eName Technology Co., Ltd.'s *Domain Registration Agreement* is located online at http://help.ename.cn/faq/3.

   a. I accessed and downloaded the *Domain Registration Agreement* from its website and include it as <u>Exhibit 10</u>, hereto.

   b. The *Domain Registration Agreement* states, "[y]ou understand and guarantee: You pledge not to use registered domain to spread SPAM like unwanted email, advertising etc. eName has the right to suspend the domain use if you violate any of it." Section 4.16.

76. eNom, Inc.'s *Web Hosting Service Agreement* is located online at http://www.enom.com/terms/agreement.asp and its *Security and Abuse Policy*, available online at http://www.enom.com/help/abusepolicy.aspx.

   a. I accessed and downloaded the *Web Hosting Service Agreement* and the *Security and Abuse Policy* from its website and include it as <u>Exhibit11</u>, hereto.

   b. The *Web Hosting Service Agreement* requires "that . . . use of the Services will not violate any laws, including, without limitation, laws relating to unsolicited commercial email . . . ." Section 12. The *Web Hosting Service Agreement* also

incorporates and binds the registrant to "other conditions related to the Services" including eNom's *Security and Abuse Policy* which states "We have a zero tolerance spam policy. We monitor the use of our system and services to ensure they are not used for the purpose of sending out unsolicited email." *See Security and Abuse Policy*.

77. GoDaddy.com's *Domain Name Registration Agreement* is located online at https://www.godaddy.com/agreements/showdoc.aspx?pageid=REG_SA.

    a. I accessed and downloaded the *Domain Name Registration Agreement* from its website and include it as <u>Exhibit 12</u>, hereto.

    b. The *Domain Name Registration Agreement* requires the registering party to agree that it will not use the services for "[t]he transmission of unsolicited email." *See* Section 8.

78. Internet.bs Corp.'s *Terms and Conditions* is located online at http://www.internetbs.net/legal/Internet.bs-RegistrationAgreement.pdf.

    a. I accessed and downloaded the *Terms and Conditions* from its website and include it as <u>Exhibit 13</u>, hereto.

79. The *Terms and Conditions* state, "We reserve the right to immediately suspend, cancel, terminate, transfer or modify your Registration for any reason, including, without limitation, if: (i) your material breach of this Agreement; (ii) your use of any Services, including, without limitation, the domain registered to you, that is in contradiction of applicable laws or customarily acceptable usage policies of the Internet, including, without limitation, sending unsolicited commercial advertisements (including, without limitation, spamming) . . . ." *Terms*

13

*and Conditions*, Section 15.a.

80. Key-Systems GmBh.'s *Registration Agreement* is located online at http://www.key-systems.net/en/registration-agreement.

    a. I accessed and downloaded the *Registration Agreement* from its website and include it as Exhibit 14, hereto.

    b. The *Registration Agreement* prohibits "spamming" which it defines as "the mailing of unrequested or undesirable e-mails for advertising purposes to third parties." *See* Section 8(6).

81. MarkMonitor Inc.'s *Domain Management Terms and Conditions* is located online at https://www.markmonitor.com/legal/tc_dm.php.

    a. I accessed and downloaded the *Domain Management Terms and Conditions* from its website and include it as Exhibit 15, hereto.

    b. In section 2.13 of its registration agreement, it prohibits sending "unsolicited commercial advertisements" and "spamming." *See Domain Management Terms and Conditions*, Section 2.13. Though "Spamming" is not defined in section 2.13 of the agreement, it is defined later as "the mass mailing of unsolicited email" and "the use of distribution lists (mailing lists) which include persons who have not specifically given their consent to be placed on such a distribution list." *See id.* section 5.2(4).

82. Moniker Online Services, Inc.'s *Domain Name Registration Agreement* is located online at https://www.moniker.com/legal/registration-agreement.

    a. I accessed and downloaded the *Domain Name Registration Agreement* from its website and include it as <u>Exhibit 16</u>, hereto.

    b. The *Domain Name Registration Agreement* identifies as "Prohibited Conduct" the "transmitting of any unsolicited or unauthorized advertising, promotional materials, 'junk mail,' 'spam,' 'chain letters,' 'pyramid schemes,' or any other form of solicitation . . . ." *Domain Name Registration Agreement*, Section 14(7).

83. Name.com, Inc.'s *Domain Name Registration Agreement* is located online at https://www.name.com/policies/registration-agreement.

    a. I accessed and downloaded the *Domain Name Registration Agreement* from its website and include it as <u>Exhibit 17</u>, hereto.

    b. The *Domain Name Registration Agreement* prohibits "the transmission of unsolicited email . . . ." Section 6.a.

84. NameCheap, Inc.'s *Registration Agreement* is located online at https://www.namecheap.com/legal/domains/registration-agreement.aspx.

    a. I accessed and downloaded the *Registration Agreement* from its website and include it as <u>Exhibit 18</u>, hereto.

    b. The *Registration Agreement* states, "You agree not to use the Services provided by Namecheap, or to allow or enable others, to use the services provided by Namecheap for the purposes of: 1) the transmission of unsolicited email (Spam) . . . ." Section 6.

SLC_2178600

85. Network Solutions, LLC's *Domain Registration Agreement* is located online at https://www.networksolutions.com/purchase-it/dynamic-service-agreement-popup.jsp and its *Acceptable Use Policy* is located online at http://resellers.networksolutions.com/aup/index.html.

   a. I accessed and downloaded the *Domain Registration Agreement* and *Acceptable Use Policy* from its website and include them as <u>Exhibit 19</u>, hereto.

   b. In its *Domain Registration Agreement*, Network Solutions prohibits conduct in violation of its Acceptable Use Policy. It states, "We may terminate this Agreement or any part of the Network Solutions services at any time . . . in the if we determine in our sole discretion that you have violated the Network Solutions Acceptable Use Policy . . . ." Service Agreement, Section10(b). Further, the Acceptable Use Policy specifically prohibits "Sending Unsolicited Bulk Email" which it identifies as "spam." Acceptable Use Policy, Section I(2). The policy also prohibits the use of its services "to solicit customers from, or collect replies to, messages sent from another Internet Service Provider where those messages violate this Policy or that of the other provider." *Id*. Further, the policy prohibits "Running Unconfirmed Mailing Lists." This is defined as "Subscribing email addresses to any mailing list without the express and verifiable permission of the email address owner . . . " *See* Section I(3).

86. PDR Ltd. d/b/a PublicDomainRegistry.com's *Registrar-Registrant Agreement* is located online at http://publicdomainregistry.com/legal/.

   a. I accessed and downloaded the *Registrar-Registrant Agreement* from its website and include it as <u>Exhibit 20</u>, hereto.

16

b. The *Registrar-Registrant Agreement* prohibits "sending unsolicited mass e-mail (i.e., to more than 10 individuals, generally referred to as spamming) (*Registrar-Registrant Agreement*, Appx. A.2(3)), "transmitting Unsolicited Commercial e-mail (UCE)" (Appx. A.2(9)(1)); "transmitting bulk e-mail" (Appx. A.2(9)(2)).

87. Register.com's *Master Services Agreement* is located online at http://www.register.com/policy/servicesagreement.rcmx.

   a. I accessed and downloaded the *Master Services Agreement* from its website and include it as Exhibit 21, hereto.

   b. Its *Master Services Agreement* states that a "Customer is prohibited from transmitting unsolicited commercial email." *See* Section 14.

88. TurnCommercs, Inc. d/b/a NameBright.com's *Terms and Conditions* is located online at https://www.namebright.com/Terms.

   a. I accessed and downloaded the *Terms and Conditions* from its website and include it as Exhibit 22, hereto.

   b. The *Terms and Conditions* contains an "Anti-SPAM" provision which states, "Unsolicited Email. You agree that you will not utilize any NameBright.com servers or services for transmitting bulk, unsolicited email to third parties without expressly having their permission to be opted-in to receive emails from you, or that are not transactional in nature." Section 20(a).

89. Wild West Domains, LLC's *Wild West Domain Name Registration Agreement* is located online at https://www.wildwestdomains.com/agreements/ShowDoc.aspx?pageid=reg_sa.

a. I accessed and downloaded the *Wild West Domain Name Registration Agreement* from its website and include it as <u>Exhibit 23</u>, hereto.

b. The *Wild West Domain Name Registration Agreement* prohibits "[t]he transmission of unsolicited email (Spam)[.]" *See* Section 8.

90. XMission has examined the identified sender domains and determined that they do not appear to resolve to any legitimate website or have any legitimate function other than mass e-mail marketing. *See* <u>Exhibit 24</u> hereto which is a compilation of all of the connection data related to the sender domains in question.

91. In fact, each of the sender domains at issue was used to transmit SPAM e-mail messages to XMission.

92. <u>Exhibit 25</u> hereto is a summary includes a list of e-mails, identified by Control ID number, that were transmitted from domains registered with domain registrars that maintain anti-spam policies. XMission maintains all of the e-mail and data used to create this summary on its servers and can produce it if the Court so requests.

93. Each time Adknowledge e-mails are received, customers complain of those e-mails. Over the ten days preceding this Motion, XMission has received 1,790 Adknowledge e-mails, and has received 654 customer complaints arising out of those e-mails. Specifically,

| Date | Number of Adknowledge E-mails | Number of Customer Complaints re Adknowledge Emails |
|---|---|---|
| 4/18/2015 | 31 | 29 |
| 4/19/2015 | 28 | 23 |
| 4/20/2015 | 110 | 99 |
| 4/21/2015 | 20 | 17 |
| 4/22/2015 | 94 | 59 |
| 4/23/2015 | 745 | 128 |
| 4/24/2015 | 559 | 127 |

| | | |
|---|---|---|
| 4/25/2015 | 42 | 11 |
| 4/26/2015 | 78 | 78 |
| 4/27/2015 | 83 | 83 |
| Totals | 1,790 | 654 |

94. <u>Exhibit 26</u> hereto is a calendar of dates on which Adknowledge e-mails were received by XMission and the number corresponding customer complaints as the result of the Adknoweldge e-mails.  XMission maintains all of the e-mails and data used to create this summary on its servers and can produce it if the Court so requests.

I declare under penalty of perjury of the laws of that State of Utah and the United States of American that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 30th day of April, 2014.

<u>/s/ Peter L. Ashdown</u>
Peter L. Ashdown

(* I certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

*Declaration electronically signed, pursuant to U.C.A. § 46-4-201(4) and District Of Utah CM/ECF and E-filing)