JILL L. DUNYON (5948)
MARALYN M. ENGLISH (8468)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145
(801) 521-9000
jld@scmlaw.com
mme@scmlaw.com

DEREK A. NEWMAN (pro hac vice pending)
NEWMAN DU WORS LLP
100 Wilshire Boulevard, Suite 940
Santa Monica, CA 90401
(310) 359-8200
dn@newmanlaw.com

*Attorneys for Adknowledge, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>    Plaintiff,<br><br>v.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>    Defendants. | **DECLARATION OF JOHN J. HERBST**<br><br>Case No.  2:15-cv-00277 TC<br><br>Judge Tena Campbell |

I, John J. Herbst, having personal knowledge of the matters asserted herein, do hereby declare as follows:

1. I am the Chief Legal Officer and Senior Vice President for Corporate Development at Adknowledge, Inc.

2. Adknowledge is a multi-channel global technology company, specializing in helping advertisers get the best return on investment from their digital media spending, at scale and in a brand-safe way.

3. Email marketing remains a key component of Adknowledge's business, which is why Adknowledge works very hard to ensure that its commercial email services are used to send email only to consenting recipients.

4. Adknowledge has multiple full-time staff continuously at work to ensure that Adknowledge's commercial email business remains compliant with both state and federal laws and regulations by following a 57-page internal compliance policies and procedures guide (the "Compliance Documentation") and a separate procedure document outlining Adknowledge's advertising/marketing content policies (the "General Marketing Guidelines").

5. Adknowledge's compliance personnel work closely with its email publisher and advertising teams to ensure selectivity in business partners and effective monitoring.

6. The compliance team also works to ensure that email advertisements generated through Adknowledge's system comply with strict rules regarding headers, content and unsubscribe links.

7. The compliance team conducts regular audits of advertising creative units to ensure compliance with Adknowledge's policies using sophisticated software tools.

8. Whenever new regulations are enacted or when updated publisher or advertiser requirements need to be put in place, the compliance team updates the Adknowledge Marketing Guidelines.  Publisher contracts are revised as necessary by the Adknowledge legal department and ensure that publisher representations and warranties require compliance with relevant

law/regulation, including but not limited to CAN-SPAM. All publisher contracts designate the publisher as the "sender" for CAN-SPAM purposes.

9. The Marketing Guidelines contain general information that applies to all advertising categories (like not making promises or guarantees, and not using superlatives). They also contain category-specific requirements for sensitive categories such as education, financial, legal, and health categories. The Marketing Guidelines also identify the categories and types of offers that may not run on Adknowledge's network.

10. Adknowledge also maintains a summary of the Marketing Guidelines, which contains a shorter overview of some of the sensitive categories, along with information that is helpful when reviewing new offers or auditing categories.

11. The compliance team has access to several audit tools that allow it to review quickly and efficiently update email advertising creative content. .

12. The compliance team tracks every violation (which for this purpose includes any reported problem with an email, including user complaints, seed hits, problems with header information, etc.) it receives in a Salesforce database. Violations are received from third party vendors that Adknowledge has hired to provide email compliance monitoring, such as Lashback and BrandVerity, as well as from advertisers, and sometimes directly from a user or account managers. The compliance team communicates with publishers to inform them of violations through Salesforce, and tracks all communication it receives.

13. There are detailed multi-step procedures to track, record and address any of the numerous ways an advertiser or email publisher could potentially violate Adknowledge's compliance practices. This includes low quality, list management issues, non-approved channels, and—more rarely—fraud. Publishers found to violate Adknowledge's rules are notified, fined, and ultimately terminated.

14.     Adknowledge maintains a database that records the compliance history for every email publisher. Each reported violation is assigned a case ID. The database records the creation date, the close date (if any) and a brief description of each reported violation so that the compliance team can readily identify repeat offenders. For each reported violation, Adknowledge records detailed information.

15.     Adknowledge has hired Lashback to find publisher compliance violations. Lashback has a toolbar where people can report on commercial email, and Lashback also subscribes to email lists with unique email addresses to track emails from Adknowledge's network. Lashback has specific rulesets and will flag emails that do not fit within the rules.

16.     If a consumer emails Adknowledge directly to be unsubscribed, the Marketing Guidelines require that Adknowledge globally suppress the user from Adknowledge's network. Most of the time, Adknowledge considers the consumer's email to mean she does not want further communication, and Adknowledge does not reply to emails. If the consumer specifically asks for a response or it comes from an advertiser requesting a response, Adknowledge replies as follows:

> "We assure you that Adknowledge takes these matters very seriously. We have strict compliance policies and procedures in place to control these kinds of issues. Your email address has been globally suppressed in our system and you should not be receiving any future emails from this source. If you do, you should send the original email to us so that we can investigate and take action as necessary."

17.     The compliance team runs a weekly Compliance Dashboard, grading Adknowledge's compliance success while identifying and correcting any problems. The Dashboard is mailed to the compliance team every Monday morning. Every week, the compliance team checks to see if there are publishers listed in the Dashboard who have had previous violations. If there are, the team reports up the violation.

18.     On a monthly basis, the compliance team circulates a monthly compliance summary to key stakeholders and holds monthly in person review meetings.

19. Adknowledge's compliance system specifically hunts down and eliminates "bad actor" affiliates that fail to comply with CAN-SPAM. Publishers found to repeatedly violate Adknowledge's robust rules are fined, notified, and ultimately terminated from Adknowledge's network. Adknowledge tolerates no threats to its legitimate and compliant email-marketing solutions.

20. Due in large part to these compliance procedures, Adknowledge has never been found to violate CAN-SPAM or equivalent state laws.

21. To the best of my knowledge, at no time prior to the date hereof has XMission ever directly contacted Adknowledge about the emails that are the subject of this lawsuit. Even after filing its complaint on April 21, XMission did not serve process and instead took time to perfect its motion for a temporary restraining order without providing any notice to Adknowledge.

EXECUTED this 4th day of May, 2015.

*/s/ John J. Herbst*
John J. Herbst

(\* I certify that I have the signed original of this document which is available for inspection during normal business hours by the Court or a party to this action.

\*Declaration electronically signed, pursuant to U.C.A. § 46-4-201(4) and District Of Utah CM/ECF and E-filing)