1                IN THE UNITED STATES DISTRICT COURT

2                         DISTRICT OF UTAH

3                         CENTRAL DIVISION

4

5    XMISSION, L.C., a Utah company, )

6            Plaintiff,            )

7       vs.                        )  Case No.  2:15-CV-277-TC

8    ADKNOWLEDGE, INC., a Missouri  )

9    Corporation; DOES 1-40,        )

10           Defendants.            )

11    _____)

12

13              BEFORE THE HONORABLE TENA CAMPBELL

14         ------------------------------------

15                      May 5, 2015

16            Status Conference/Motion for TRO

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

1                          A P P E A R A N C E S

2

3

4    For Plaintiff:              Evan A. Schmutz
                                 Jordan K. Cameron
5                                DURHAM JONES PINEGAR PC
                                 3301 N. Thanksgiving Way, #400
6                                Lehi, Utah  84043

7

8    For Defendant:             Derek A. Newman
                                 NEWMAN DU WORS LLP
9                                100 Wilshire Blvd., #940
                                 Santa Monica, California 90401
10

11                               Jill L. Dunyon
                                 Maralyn M. English
12                               SNOW CHRISTENSEN & MARTINEAU
                                 10 Exchange Place, 11th Floor
13                               Salt Lake City, Utah  84111

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        SALT LAKE CITY, UTAH; TUESDAY, MAY 5, 2015; 10:00 A.M.

 2                        PROCEEDINGS

 3            THE COURT:  We're here in XMission vs.

 4   Adknowledge, here in a combination of status and motion for

 5   TRO that was filed by XMission.

 6            Representing XMission is Mr. Schmutz, Mr. Cameron,

 7   Mr. Ashdown and Mr. Webster.  For Admission, we have

 8   Ms. English, we have Mr. Newman, we have Mr. Herbst, and we

 9   have -- is it Ms. Dunyon?

10            MS. DUNYON:  Yes.

11            THE COURT:  There is sort of the minor-est of

12   conflicts, but it's the best I could do.  My clerk,

13   Ms. Rice, has XMission.  However, when I went to my other

14   clerk, she is going to return -- she's been working for Snow

15   Christensen, and she's going to return.  So it was the

16   lesser of two conflicts.  If down the road I can assure

17   you -- I don't think that makes much difference, but if you

18   feel that that is a conflict that has to be resolved, let me

19   know and I can simply do this on my own, but everybody's

20   results.  It's going to be slower and less good without

21   Ms. Rice, I will tell you that.

22            I know, Admission, that you received notice very

23   late.  That's because this -- as TROs go, they always come

24   in fast.  Generally I do not grant TROs.  I simply have a

25   status.  However, I was struck by the number of spam e-mails
```

1    and customer complaints that, according to XMission, it had

2    received in the ten days before it filed its motion.  And

3    that inclines me, to some degree, although I have so many

4    questions, to try and reach some sort of an agreement that

5    will stop it before I can have a full-blown evidentiary

6    hearing.

7          And I know, Admission, you say that because of

8    some encryption problems, you are unable to simply stop

9    activity that goes on to XMission.  You would have to stop

10   down your whole operation.  I'm no technical expert, but I

11   found that somewhat strange.  But I've got that definitely

12   in my mind.

13         Having said that, what I want you to do, XMission,

14   is to do what I think is somewhat familiar to you.  You have

15   done that before, Mr. Schmutz, I know you have, with ZooBuh.

16   You walked Judge Nuffer through the process of what you

17   think is happening, how you think Admission is somehow

18   either procuring transmissions or being a transmitter

19   itself, irreparable harm, et cetera.  If you had to start at

20   the beginning with Judge Nuffer, let me tell you your job is

21   doubly hard with me.  Okay.

22         Then I'm going to ask the same of you, Admission.

23         Who's going to start?

24         MR. SCHMUTZ:  Mr. Cameron will argue for XMission

25   on this.  We should correct the record, both of us noticed,

1   the defendant's name is Adknowledge.

2            THE COURT:  See, already your work is cut out for

3   you, isn't it?  Adknowledge.  Adknowledge.  Sure it is.

4            Go ahead, please.

5            MR. CAMERON:  Thank you, Your Honor.

6            If it pleases the Court, there are a few points

7   that are directly related to your questions that I would

8   like to outline at the outset that directly go to

9   specifically the procurement question as well as the harm

10  element here.

11           And I think to best address that, it would behoove

12  the Court to identify specifically issues that are not in

13  dispute that directly relate to the questions that this

14  Court may have.  And in reviewing the written memoranda,

15  both that we filed and Adknowledge filed, as well as

16  comparing the submitted declarations which were submitted,

17  appropriately, under oath, the Court can reach certain

18  conclusions on relevant material issues that are not in

19  dispute.

20           The first of those is that XMission is a bona fide

21  Internet service provider.  That question is not in dispute.

22  The question that was raised, which this Court identified,

23  is to what extent XMission is adversely affected or, more

24  particularly, with reference to the TRO standard, to what

25  extent they will be irreparably harmed.

1              THE COURT:  And I carefully read and I compared it

2       to the Gordon case.  It seems to me that -- but that wasn't

3       in the context of a TRO.  It seems to me, given the amount

4       of resources you devote, given your size, to the prevention

5       of spam, and the dollar amount and the amount of customer

6       complaints, although I don't know really that I have a basis

7       for that, that might be hearsay, I could see that you are

8       irreparably harmed.  The irreparable harm that I am

9       primarily worried about now is in the ten days that would

10      last.

11             MR. CAMERON:  I appreciate that clarification

12      because, as this Court aptly points out, there's a harm

13      standard for standing, which, from what I understand this

14      Court is saying, that's essentially satisfied here.

15             THE COURT:  I think so, although I'm sure we're

16      going to hear differently, and then you might have to answer

17      questions.

18             MR. CAMERON:  I would agree with this Court that

19      it is and I can rebut any argument that's raised.  So I will

20      forgo any argument on that point right now.

21             With respect to the irreparable harm for purposes

22      of a TRO, if I may identify some other issues that are not

23      in dispute that will directly associate and relate to that,

24      and this is important for the Court to take note of.

25             The memorandum in opposition that was filed by

1    Adknowledge does not dispute or challenge our analysis

2    regarding violations of the CAN-SPAM Act.  They simply state

3    we don't have the e-mails, so we can't make an assessment.

4    However, they ignore the fact that we provided adequate

5    summaries, all of the relevant data in summary fashion, and

6    a significant analysis of four different violations of the

7    law.  The Court can conclude, based on the absence of

8    challenge to that analysis, that --

9              THE COURT:  What did your analysis -- I saw the

10   analysis, but when I went into your exhibits, it seemed

11   mostly kind of numerical.  Do you have examples of some --

12             MR. CAMERON:  I do, and perhaps that's a function

13   of the failure to adequately explain what the exhibits are

14   actually showing.  For the benefit of the Court, we do have

15   and have preserved every single one of these e-mails in its

16   original format.  That is 65,000 e-mails.

17             I can also represent to the Court that as of the

18   date of filing, the complaint as well as this TRO, we had

19   not, given the sheer amount of resources it requires,

20   analyzed and processed every single potential e-mail that

21   could be associated with Adknowledge.  However, I requested

22   one of the technical associates with XMission to do an

23   expedited review to the extent he could.  I can represent to

24   the Court that as of last night, e-mails that I received

25   around midnight last night, they have identified an

1    additional 60,000 e-mails that contain Adknowledge links

2    that were transmitted primarily in the month of March.

3              THE COURT:  You're talking 120,000?

4              MR. CAMERON:  120,000.  And we've not yet

5    identified or even been able to analyze more than the tip of

6    the iceberg on e-mails received in April and have not even

7    begun, other than the e-mails of which a customer complains

8    and so they are at the forefront, to identify any e-mails in

9    May.  This is a colossal endeavor.

10             The second, we were retained by our client to

11   analyze these e-mails and determine if they were violations.

12   We began as expeditiously as possible.  But it takes

13   significant time to analyze 65,000 e-mails, let alone

14   120,000, potentially 180 -- possibly 200,000 e-mails over a

15   short period of time.

16             THE COURT:  What told you that these are linked to

17   Adknowledge?

18             MR. CAMERON:  The primary basis upon which we

19   reached that conclusion is the link within the e-mail itself

20   that does identify Adknowledge, which is not in dispute.

21   Excuse me -- that's correct, Adknowledge.

22             THE COURT:  Have I got you on the wrong word?

23             MR. CAMERON:  It's Adknowledge.  I was thinking

24   Admission and I confused myself.  That's okay.  I think

25   we're all clear now.

1          That's another point that I would like to identify

2     for the Court that is an issue that is not in dispute, and

3     that is fundamentally Adknowledge admits that it pays per

4     click for every one of its links in the e-mails that is

5     opened and that is clicked by the recipient.  This is of

6     primary importance in determining and answering the

7     procurement question.

8          Specifically, the way Adknowledge describes this

9     industry is correct.  There are essentially three parties,

10    four if you include the ISP that's receiving the

11    transmission.  The first party is the advertiser.  Within

12    the industry, the advertiser is identified as the party who

13    wants to promote their product.

14         The second is the marketing network.  Adknowledge

15    admits that it is a marketing network.

16         The third component is a publisher.  A publisher

17    can take many forms, but essentially, and I believe

18    Mr. Newman would agree, though he can correct the record if

19    he doesn't, a publisher is essentially the party who

20    directly controls the transmission of those e-mails.

21         Important to note, however, Your Honor, is the

22    fact that within the definition section of the CAN-SPAM Act

23    itself, under Section 7702, and I believe it's definition

24    nine, which identifies initiator, the law recognizes that

25    multiple parties can be considered to be an initiator of one

1    e-mail.  And the law recognizes that because when the law

2    was passed, it was recognized that this is the process, this

3    is the system that is used to transmit the e-mails.  Very

4    rarely do we have a situation where the marketing network

5    actually clicks send to transmit the e-mail.

6           In recognition of that, the law specifically

7    identifies there can be multiple initiators.  The law

8    delineates liability between a sender and an initiator.  The

9    sender under the law is defined as a party whose product,

10   service or Web site is promoted by the e-mail and who

11   transmitted or procured the message.

12          THE COURT:  In your three-party system, which one

13   is going to be the sender?

14          MR. CAMERON:  The advertiser primarily will be the

15   sender.

16          There was some indication in the brief and in the

17   supporting declarations filed by Adknowledge that they have

18   somehow contractually altered the definition of sender and

19   determined within their contracts that the publisher is the

20   sender.  I don't think you can contract around the statute.

21   So I think this Court would conclude and I think the statute

22   is clear that in this circumstance the advertiser would

23   primarily be identified as the sender.

24          We don't have a sender here.  We're not seeking to

25   attribute liability to a sender at this stage because we

1    don't know who they are.  Of course we'll gather that

2    information in discovery and potentially add new parties to

3    this case.

4         With respect to Adknowledge, they are an initiator

5    as the second party in the chain that sets this process in

6    motion.  They're the ones who bring the advertiser and the

7    publisher together.  They contract with the advertiser to,

8    in some cases, create, which I think they've admitted, that

9    they have approved header information, approved from lines,

10   approved unsub links, thereby participating in the creation

11   of the e-mails, the creation of the advertisements.

12        They then turn the transmission over to their

13   publishers, who actually click send.  And when the links are

14   clicked, Adknowledge is paid directly by the advertisers.

15   That's how it earns its money.  Then it turns around and

16   pays a commission to the publishers.  These are all admitted

17   facts.  None of this is in dispute.  Within that context,

18   the statutory definition of initiator directly corresponds

19   to both Adknowledge and its publishers that are not

20   identified, that are impossible, from our side of the table,

21   to identify.

22        Of course the fourth party that is defined and

23   that is material with respect to the CAN-SPAM Act would be

24   the Internet service provider who receives the e-mail and

25   who carries the burden of transmitting those.  Of course

1    this Court recognizes that the individual consumer, the

2    individual recipient does not have a private right of action

3    under the law.  The only party with a private right of

4    action is XMission, and XMission is exercising its rights

5    through this lawsuit.

6            One thing that's very important, and I would like

7    to address the procurement argument in a little more detail

8    in a moment, but to get there I think discussing the context

9    of a TRO is highly valuable.

10           All we are requesting for purposes of a TRO and,

11   for that matter, for purposes of a preliminary injunction is

12   that Adknowledge comply with the law.  Under 15 U.S.C. 7704

13   (a)(5) -- or (a)(4), excuse me, it is prohibited to send an

14   e-mail after an opt-out request is received.  It is not in

15   dispute that Adknowledge -- or, excuse me, that XMission

16   attempted to unsubscribe from every single one of these

17   e-mails.  However, the e-mails continue on a daily bassi,

18   and the customer complaints, which are the result of a

19   manual activity of the customer, contrary to what

20   Adknowledge alleges.  They have no knowledge on that.  It's

21   pure speculation on their part.  Of course, at an

22   evidentiary hearing, we'll present testimony on that.

23           The customer complaints are coming in every single

24   day.  Every single time these e-mails are received,

25   customers are complaining about that.  Adknowledge raises

1    the question --

2              THE COURT:  What form is the complaint?

3              MR. CAMERON:  The process by which -- and this is

4    of course a proffer, Your Honor.  I personally don't have

5    personal knowledge, but I have interviewed my client about

6    it.  They have established a mechanism, which is

7    technologically based, by which their customers can manually

8    flag and identify messages as spam, as unwanted, and thereby

9    submit a complaint to XMission about that.

10             It would be a colossal endeavor and cost

11   prohibitive to require a company of XMission's size to staff

12   a call center to take calls for every single customer

13   complaint.

14             THE COURT:  So when it comes to your client

15   XMission, XMission will receive what?

16             MR. CAMERON:  It might be better to ask

17   Mr. Ashdown to answer this question.  But my understanding

18   and the data that we've analyzed is that they will receive a

19   notice through an electronic means that this particular

20   message has been flagged by the customer as spam and they

21   are complaining of that e-mail.  The record is then logged,

22   and with those logged records, of which all of the data is

23   stored on XMission servers and we can produce it to the

24   Court, it's voluminous, it would most likely comprise 80,000

25   plus pages of documentation, maybe more, with that data and

1    access to that data, we created one of our exhibits, which

2    merely identifies the e-mail by control ID numbering, it's a

3    Bates stamp basically, it's a scientific e-mail, of which a

4    complaint has been received.

5             THE COURT:  You are allowed to do that.  You have

6    an agreement with your customers that allows you, what, to

7    unsubscribe?

8             MR. CAMERON:  It does.

9             THE COURT:  But if you only received, as I

10   understand it, although I imagine the number is changing,

11   about 6,000 complaints, and there were 120,000 e-mails

12   linked to Adknowledge, then do you have the right to

13   unsubscribe on behalf of those recipients who have not filed

14   a complaint?

15            MR. CAMERON:  We do, Your Honor, and I will -- if

16   I may, let me describe that process a little bit and also

17   provide some clarification for the Court.

18            With the additional 60 or 80,000 e-mails that we

19   believe are out there, possibly more, there will be many

20   more customer complaints.  We simply just have not

21   identified the customer complaints associated with those

22   e-mails yet.  So within the context of what we have on paper

23   and what we've analyzed today, 64,000 e-mails and

24   approximately 7,000 complaints, the Court must understand

25   that these e-mails were not sent to 64,000 different e-mail

1   addresses.  In fact, they were sent to I believe less than

2   5,000 different e-mail addresses.

3          So what we have is a situation where we have

4   complaints in number that exceed the number of recipients

5   who are actually receiving these e-mails.  It is possible,

6   though without the data and without an in-depth analysis I

7   can't state with any sort of conclusion, that the majority

8   of recipients are complaining about these e-mails.  However,

9   be that as it may, it is not required under the law or under

10   XMission's policies to receive a complaint from a customer

11   in order to opt them out.

12          The way this process works and through the terms

13   of service, every single customer of XMission agrees that

14   XMission may take a proactive effort to unsubscribe and to

15   combat spam.  The purpose for that is recognized and

16   inherent in the CAN-SPAM Act, which is that XMission is the

17   one who carries the burden.  XMission is the one who's

18   paying the price for it.  XMission is the one with standing,

19   therefore XMission should be the one to say whether or not

20   they want to receive them.

21          An individual customer's right is insignificant in

22   comparison to the ISP's right when we're discussing e-mails

23   of this volume.

24          THE COURT:  As I understand from your papers, the

25   unsubscribe or the -- the language is found in the message

1    and it doesn't work; am I right?  Who's trying to

2    unsubscribe, XMission or the consumer?

3               MR. CAMERON:  It could be a combination of both.

4    We don't necessarily have data on every unsubscribe link

5    that an individual customer clicks.  But what we do know is

6    through the processes that they have established, every

7    single one of those links is clicked when an e-mail arrives.

8    When a message is identified as potentially being spam, it

9    goes -- it's routed to a specific location or it passes

10   through a system in the transmission process before it

11   arrives to the customer's inbox wherein those unsubscribe

12   links are clicked with the hope that the e-mails will stop

13   of course.

14               Under 7704(a)(4), Adknowledge is required to stop

15   those e-mails within ten days.  The only thing that we're

16   requesting with respect to this TRO is that Adknowledge

17   follow the law, that they comply with the law.  XMission has

18   attempted to opt out.  They've been unsuccessful.  Within

19   minutes of this hearing, I can provide to Adknowledge, to

20   the extent they need it -- in their briefing they've said

21   we've identified XMission's domains and we've confirmed our

22   publisher has sent these e-mails -- we can provide them a

23   list of all the domains that we want unsubscribed.  The law

24   requires them to have a process in place to suppress that

25   and to stop the e-mails.

1          THE COURT:  I'm sorry to interrupt you, but I'm

2    just with my thought process.  So you have identified the

3    domains that you want them to stop, that you think that you

4    have unsubscribed unsuccessfully?

5          MR. CAMERON:  We have not identified them in the

6    filings that we filed with the Court.  The way they have

7    been identified is through the process of clicking on the

8    unsubscribe links, which presumably and under the law are

9    supposed to transmit the data to Adknowledge, and within ten

10   days they have to honor that.

11         THE COURT:  And it hasn't worked?

12         MR. CAMERON:  And it hasn't worked.

13         THE COURT:  So from that procedure, you have been

14   able to identify what that you can then give to Adknowledge?

15         MR. CAMERON:  We've identified every single domain

16   that XMission hosts that's receiving these e-mails.  We can

17   provide that in an Excel spreadsheet, which is the commonly

18   accepted form for suppression lists, based off of our

19   experience, we've been doing this for a long time, to

20   Adknowledge, and they should and the law requires them to be

21   able to suppress those.

22         THE COURT:  When you say every single domain, are

23   you then speaking of the third party, the publisher?

24         MR. CAMERON:  No.  The domains that I'm referring

25   to are XMission's domains.

1              THE COURT:  XMission's domains.

2              MR. CAMERON:  Which might be at xmission.com, but

3       they also provide customized domains for their customers.

4              THE COURT:  You're going to have to walk me

5       through that step.

6              MR. CAMERON:  Before I get there, if I may, I

7       would like to address a few more points regarding the

8       procurement analysis.

9              THE COURT:  Absolutely, but be sure and walk me

10      through, because this is key, because you can probably tell

11      that if I grant anything, I am going to tailor it as

12      narrowly as possible.  If I could -- and don't panic over

13      here, I haven't heard you yet, Adknowledge -- I need to know

14      how domain figures into this.

15             MR. CAMERON:  So let me address two points.  I've

16      kind of gotten out of order.  You know how that goes.

17             THE COURT:  Yeah, I think out of order.  So that's

18      why you're where you are.

19             MR. CAMERON:  I think we think in different

20      orders.  Maybe that's it.

21             I think I've stated this, but it's not in dispute

22      that XMission has attempted to opt out.  I think the record

23      is clear on that.

24             This I think, Your Honor, is really the fulcrum

25      point of their procurement argument, and there are actually

1    two.  The first comes from a very telling and, in fact,

2    troubling admission by Adknowledge, which is their

3    contention that they have to shut down their entire business

4    in order to stop e-mailing XMission.

5          Under the law, they are required -- absolutely and

6    fundamentally required to be able to suppress within ten

7    days.  If, in fact, it is true that they have to shut down

8    their entire business to stop e-mailing Adknowledge, their

9    entire business exists in perpetual violation of the

10   CAN-SPAM Act, willfully and knowingly.  They are sending

11   these e-mails, they are paying parties to send them, they

12   are receiving unsub requests, and unless they shut down the

13   entire business, they can't stop it.

14         However, the law requires it.  They know the law

15   requires it.  They know, in going into this, in pushing the

16   boulder down the mountain, that if somebody wants them to

17   stop that boulder, they need to be able to stop it.  Yet,

18   they seek sympathy of this Court because it's standing atop

19   of their mountain watching the destruction of the path of

20   this boulder that they've put in motion, saying, Your Honor,

21   we can't stop this.  We can't be expected to stop this.

22   This is somebody else's fault.  It's nobody else's fault.

23         Adknowledge admits that it bridges the gap.  It

24   brings in the advertisers, it brings in the publishers, and

25   it pushes this boulder down the mountain.  And when it's

1    requested to unsub, which the law fundamentally requires, it

2    has to shut down its entire business.   This Court should be

3    very concerned that the entirety of their business,

4    specifically the e-mail marketing portion of it, exists in

5    violation of the law.

6           To that point, Your Honor, they raise various

7    arguments, really conclusory statements about their policing

8    efforts, about their policies that are in place to make sure

9    that their publishers comply with the law.   In raising those

10   policies, there are various contradictory statements, which

11   I will address later.   But I think important for this Court

12   to note, and which is supported by the ASIS decision that we

13   cited, which of course we recognize is not binding on this

14   Court, but the Court must recognize that there are very few

15   decisions binding on this Court, if any, with respect to the

16   CAN-SPAM Act.   So we take what we can find if we were

17   creating law here.

18          But the Court need recognize that the very process

19   that they have established through which their business

20   operates is to incentivize publishers to get e-mails in

21   those inboxes and induce parties to click the links, because

22   if those links are not clicked, Adknowledge, by admission,

23   is not paid.   If the publishers don't get those links

24   clicked, and these are the Adknowledge links in the e-mails,

25   the publishers are not paid.   They have created a situation

1    where these publishers have to get the e-mails in the

2    inboxes.  So the Court needs to understand the technological

3    landscape of this.

4            We have in place with XMission a very

5    sophisticated spam suppression and interference process.

6    They subscribe to all of the latest RBL lists, all the

7    latest blacklists.  These are the lists that are constantly

8    being generated identifying the domains from which spam is

9    originating.  They subscribe to SpamAssassin, which is

10   pretty much at the helm and the lead of this fight with

11   spam, all of which are designed to specifically identify

12   criteria and e-mail, flag them as spam, and prevent them

13   arriving at a customer's inbox.

14           So what do the publisher's have to do to get

15   around that?  They have to, through technological means,

16   through sophisticated effort, develop ways to bypass those

17   filters.  In doing so, as demonstrated by the clear number

18   of uncontested violations of the CAN-SPAM Act, they have to

19   violate the law.  If they don't falsify header information,

20   those e-mails are going to be blocked by the spam filters.

21   If they don't put in sender names that are intended to

22   obfuscate, to confuse, to bypass filters that ultimately are

23   misleading, generic or nonsensical, those e-mails are going

24   to be blocked by spam filters.  Yet they boast of 30- to

25   40-percent higher click through rates than their

1    competitors.  This is very telling.

2          Coupled with the admission that they can't stop

3    the e-mails once they start them, otherwise they have to

4    shut down their whole business, combined with the fact that

5    this is incentivized click marketing, which fundamentally

6    requires that those e-mails get into the inboxes, that they

7    get opened and they get clicked, necessarily requires

8    violations of the CAN-SPAM Act.  If not, the filter is going

9    to block them.

10          They have created a business that exists

11   fundamentally on violations of the law.  And while they may

12   have paper contracts in place that passively state, you

13   agree that you will comply with the law, they cannot rely on

14   that as a pure defense.  Procurement requires that they

15   verify and confirm that they are not violating the law.

16          We have 65,000 e-mails.  We've identified, if you

17   combine the numbers, nearly 100,000 violations of the

18   CAN-SPAM Act within those 65,000 e-mails.  Those e-mails

19   were intended to bypass filters, they were intended to get

20   in inboxes, and they were intended to be clicked.  And when

21   we want them to stop, they have to shut down their whole

22   business to do it.

23          This is the definition of procurement.  This is

24   exactly what the law was designed to prevent.  This Court

25   should not take sympathy on the company who pushes the

1    boulder down the mountain, especially where it's causing

2    significant harm in its path.

3         With respect to the irreparable harm argument,

4    Your Honor, unless there are additional questions on

5    procurement, I hope I've explained it clearly and the Court

6    understands our position.  And I will reference briefly that

7    there is some case law out there that we've cited that

8    identifies even where there are contracts in place, such can

9    be viewed as a paper tiger or a sham where the very nature

10   of the business incentivizes violations of the law.  We

11   believe that's the exact situation we're operating within

12   here.  And it's even more telling, as I've discussed really

13   ad nauseam at this point, that they can't stop the e-mails

14   even if we ask them to.  They have to shut down their entire

15   business.

16        With respect to irreparable harm, I think the main

17   point, Your Honor, that needs to be addressed is twofold.

18   The first is it's true that the law requires harm to be

19   attributable to e-mails that violate the CAN-SPAM Act.  We

20   identified four different types of violations of law which

21   are not in dispute.  They didn't even challenge the

22   analysis.  Every single one of these e-mails in question has

23   at least one of those violations.  And, though, we don't

24   believe we're required to, if we needed to, Your Honor, we

25   could identify 100, 200, 300, 500,000 additional e-mails

1   that XMission received from other parties that also are

2   violating the Act in the same way.  This is not an issue.

3   This is a red herring.

4          The question is what is the irreparable harm that

5   this Court has clued into.  And, Your Honor, I apologize, I

6   was slipping back into the adverse effect prong.  But with

7   respect to irreparable harm for purposes of a TRO, I

8   believe, as we've cited in our brief, that the advisory

9   notes or the legislative notes in the CAN-SPAM Act identify

10  two or three types of harm that are, of their very nature,

11  irreparable, that is delay of legitimate e-mails, that is

12  interference, that is loss of efficiency of a legitimate

13  Internet access service.  That, coupled with the ongoing

14  customer complaints, which I've explained to the Court the

15  process, which are manually generated, require some sort of

16  manual intervention by a customer, clearly demonstrates that

17  the harm is ongoing.

18         This is a tight-knit community in the downtown

19  Salt Lake City area.  Although XMission offers Internet

20  services in other areas, the majority of its business comes

21  from this general area.  One customer in a business where

22  customer is king, one disgruntled customer who is out on the

23  streets saying, I keep getting these e-mails, XMission is

24  telling me they're unsubscribing, I keep getting them, they

25  cannot offer what they have been promising to offer us for

1    20 years, that could have a catastrophic effect.  And the

2    law does not require us to actually show irreparable harm,

3    simply a likelihood of it if this process doesn't stop.

4         What we have identified is nearly 7,000 customer

5    complaints over the course of two months, that we have

6    identified.  The number could be significantly higher once

7    we have an understanding of the full scope of the e-mails,

8    the full volume of e-mails.

9         We have identified, in the last ten days prior to

10   our filing the motion, that the e-mails continue to come in,

11   the ones that we're identifying, that are easily identified

12   because customers are complaining about them, and that we're

13   getting customer complaints for nearly every single one.  I

14   printed off last night a report of the e-mails we've been

15   able to identify up through March 3rd, and I can present

16   that to the Court.  I've got three copies.  I can give one

17   to opposing counsel.

18        THE COURT:  March 3rd or May 3rd?

19        MR. CAMERON:  May 3rd.  Excuse me.

20        I believe it's the last one that will show that as

21   the e-mails continue, the complaints continue.  Of course I

22   do need to identify for the Court that these aren't all the

23   e-mails.  These are just the ones that we've been able to

24   scrape off the top.  But what it does show is a pattern of

25   continuing e-mails, a pattern of continuing customer

1    complaints.

2              And while I recognize, Your Honor, that the

3    numbers identified in this are not significant, that's a

4    function of our inability technologically and time-wise to

5    identify and categorize all the e-mails.  With more time,

6    certainly these numbers will increase substantially.  But

7    what it shows is that for nearly every single e-mail,

8    customers are complaining.  We've tried to opt out.  We've

9    tried to unsubscribe.  It hasn't happened.

10              The law recognizes that this type of harm,

11    customer complaints, harm to reputation, the loss of

12    goodwill is irreparable because it cannot be calculated to

13    an exact sum.  We've demonstrated with significant evidence

14    and sufficient evidence that customers will continue to

15    complain.  The only possible conclusion is that that will

16    irreparably harm XMission's reputation, it will harm their

17    customers for which XMission, frankly, through its

18    contracts, almost ends as a fiduciary for purposes of

19    presenting this type of harm, that it will continue to

20    experience delays of legitimate e-mail, that it will

21    continue to expend money on a daily basis.

22              While we recognize that, yes, and we will concede,

23    there are other e-mails that are coming in, Adknowledge is

24    not the only offender, we have to start somewhere.  The

25    numbers for Adknowledge are significant.  And obtaining a

1   TRO against a significant commercial marketer like

2   Adknowledge will directly assist in the necessitation of

3   XMission's reputation with its customers, because even those

4   customers are continuing to receive the e-mails and

5   continuing to complain about them, if XMission can represent

6   we weren't getting what we wanted through technological

7   means, we took the matter to the Court and the Court has

8   prohibited them from sending more e-mails, we will be able

9   to prevent the harm.

10          But without that we can't because the perception

11  is that XMission advertises one thing, it cannot offer it,

12  and despite the number of complaints and despite the

13  unsubscription attempts, the e-mails keep coming.  And one

14  customer who starts to spread that information can have a

15  catastrophic effect, let alone the number of customers it

16  takes to comprise nearly 7,000 complaints.  So I think based

17  off of that, this Court can conclude that irreparable harm

18  is imminent and certainly likely, which is the standard.

19          THE COURT:  Let me just ask you, going back to my

20  first -- or one of my questions, you said not so long ago,

21  and you probably got it in -- you've got it in your papers

22  and I think it's found in paragraph 68 of Mr. Ashdown's

23  declaration, you've identified certain sender domains --

24          MR. CAMERON:  Correct.

25          THE COURT:  -- are these the domains that you

1    would ask me to tell Adknowledge to shut down, or how does

2    it work?

3                MR. CAMERON:  No.  And help me understand that,

4    Your Honor, because I understand the technology, it's new,

5    it's changing every day and it can be confusing to

6    understand where we're talking about domains on two

7    different sides, so maybe I can paint a picture for the

8    Court that will help the Court understand.

9                THE COURT:  Tie it in, if you would, to the three

10   parties, particularly the publisher that transmits, and et

11   cetera.

12               MR. CAMERON:  The domains that we've identified

13   for purposes of our violations --

14               THE COURT:  Is that in paragraph 68?

15               MR. CAMERON:  Yes, although I don't have that in

16   front of me.  My memory --

17               THE COURT:  I think it is.

18               MR. CAMERON:  We have provided exhibits

19   identifying all of those domains.  Those are not XMission's

20   domains.  They are not recipient domains.  Those domains are

21   the domains used by the publishers to transmit the e-mails.

22               THE COURT:  I figured that out.

23               MR. CAMERON:  In order to transmit, there has to

24   be a domain from which to transmit an e-mail, and that

25   domain has an associated IP address.  Of course, we've

1   identified 15,000 e-mails that were sent where the domain

2   and the IP don't match, which is fundamentally false

3   information in the header, and we've alleged that's a

4   violation.  That's not in dispute.

5           But the Court must understand that the sender

6   domain is different from the domains that we're attempting

7   to suppress.  On the one side you have the advertiser, who

8   doesn't have the technology to send their own e-mail

9   advertisements.  You have publishers who have registered an

10  infinite number of generic, nonsensical domains with no

11  other purposes other than to send spam e-mails, in most

12  cases in violation of the very policies that they've signed

13  and agreed to when they registered that domain, which we've

14  identified as a violation of law and provided adequate

15  summaries of evidence on that point.

16          With Adknowledge's help, Adknowledge brings

17  together these publishers with the domains and the

18  advertisers and they create the e-mails and they're sent

19  out, and they're sent and transmitted from domains.

20          THE COURT:  When you say those domains, the

21  publishers' domains, and you're talking about 68?

22          MR. CAMERON:  Yes.  I don't have -- I have our

23  exhibits.  I can point out the exhibit if that would help,

24  the specific exhibit that I'm referring to for the Court to

25  clarify.  I don't have the declaration in front of me.  When

1    our staff put this together, it looks like they forgot to

2    include that, so I apologize.

3            What we've identified is in Exhibit 25, we've

4    submitted a document that looks like it's several hundred

5    pages long, that identifies some key information.  In the

6    first line of each block, it identifies the domain

7    registrar.  The domain registrar is a third party and

8    they're not related to this action.  They're not

9    responsible.  They exist under the ICANN Convention

10   internationally for the purpose of registering domains.

11   They have certain compliance protocols to be a part of

12   ICANN.

13           Through those domain registrars -- the common one

14   that this Court is probably familiar with is GoDaddy.

15   GoDaddy is a common domain registrar that most people have

16   heard of, and that's because they advertise on TV.

17   GoDaddy's role is to merely facilitate the registration of a

18   domain that will exist online for whatever purpose.

19           The domain registrars maintain terms and

20   conditions, terms of services and registration agreements,

21   that in large part prohibit certain types of mass e-mail

22   marketing.  We've addressed that in our brief, and I don't

23   need to go into detail on that.

24           A publisher will go to this domain and will

25   register domain names from which to send these e-mail

1    addresses.  So the second piece of information that we have

2    on this exhibit under the large print header identifying the

3    domain registrar is a domain name.  And then under that you

4    have numbers, a series of numbers.  Those numbers identify

5    individual e-mails.  There are Bates stamp numbers for the

6    e-mails.

7            So on page one of this document, it says 1&1

8    Internet AG.  That's the domain registrar.  Below that is

9    the sender domain that was registered with that registrar,

10   which is familylivesafe.net.  Then there were three e-mails

11   transmitted with that --

12           THE COURT:  Is there any way we can display that?

13   Can you display that exhibit?  We've got a very fancy --

14           MR. CAMERON:  I've never used it, Your Honor, so I

15   don't know how to do that.

16           THE COURT:  I certainly don't.

17           Ms. Ford, do you?

18           THE CLERK:  If you will pull that drawer out right

19   under your --

20           MR. CAMERON:  Right here?

21           THE CLERK:  Yes.  And then just put the document

22   on the screen, it should come up.

23           There you go.

24           THE COURT:  Are you seeing it?  All right.

25           MR. CAMERON:  So, Your Honor, the top left corner

1   identifies 62,861 messages.  That's the total number of

2   e-mails that we contend were sent in violation of various

3   provisions of CAN-SPAM, and we've identified that in our

4   brief.

5           Where you see 1&1 Internet AG, that identifies the

6   domain registrar who maintains an anti-spam policy.  Where

7   you see familylivesafe.net, that identifies the actual

8   sender domain that was registered through 1&1 Internet by a

9   publisher and then transmitted e-mails for Adknowledge that

10  included Adknowledge links and for which Adknowledge paid

11  each time a link was clicked in their three e-mails, and

12  these are the Bates numbers for those e-mails that fit that

13  criteria.

14          If you move down to the next section, BigRock

15  Solutions, Ltd, this is another domain registrar.  They also

16  have an anti-spam policy.  The domain that was registered

17  through BigRock is actualmove.net.  Through actualmove.net,

18  there were 2,126 messages transmitted.  And if we skip ahead

19  to page seven, there were seven pages of Bates numbers for

20  those e-mails that will identify the next sender domain that

21  was registered with BigRock, but only transmitted one

22  message.

23          THE COURT:  So can I summarize, and you tell me if

24  I'm off?  What you've put in 68 are the registrar sender

25  domain and then there are several domain names that are

1     registered under each of these.  What you would propose to

2     give to Adknowledge would be such things as the family, et

3     cetera, and have them stop there, or no?

4             MR. CAMERON:  No.  This is just the first part of

5     the puzzle.  So we're almost there.  This shows us the

6     domains from which the e-mails are sent.  That's what it

7     shows us.  It directly relates -- this is all the evidence

8     the Court would require to determine a violation of law.

9     We've identified 60 plus thousand of those violations.

10            The e-mails are then sent and they are received by

11    XMission's mail servers.  In the individual e-mails, you

12    have a from line, which is a name and a sender domain, and

13    you have a recipient line, which identifies an e-mail

14    address.  If it were being sent to me, it would be

15    jcameron@djplaw.com.  The recipient domain is djplaw.com.

16            In this case, there are 65,000 plus e-mails, that

17    we've obviously identified and analyzed, that were sent to a

18    variety of sender domains, john@XMission.com -- recipient

19    domains.  Excuse me.  John@XMission.

20            THE COURT:  But you say there were only about

21    5,000, am I right?

22            MR. CAMERON:  There were only about 5,000

23    individual e-mail recipients.  There are even fewer

24    recipient domains.  We can identify every single one of

25    those and provide those to Adknowledge so they have a list

1    of here are all of our domains and you put them on a

2    suppression list, and the e-mails stop.  That's the way this

3    industry is intended to work.  That's what the CAN-SPAM Act

4    requires.

5              THE COURT:  So the recipient domain names that you

6    would provide are nothing without your giving a list

7    Adknowledge says they have, but you would give them the list

8    and you say they've unsubscribed, stop it?

9              MR. CAMERON:  Right.  And to make clear,

10   Adknowledge and their publishers are sending the e-mails.

11   They have all the e-mail addresses.  They have all the

12   domains.  To facilitate the suppression of those, we will

13   provide a list.  However, we need the Court to recognize --

14   and perhaps we can enter into an open stipulation that

15   perhaps could make its way into the TRO -- that XMission's

16   list is a trade secret.  If this list gets out to its

17   competitors, they will know XMission's customers.  If it's

18   shared by Adknowledge or sold, worst case scenario, to

19   publishers, to other network marketers, it could result in a

20   colossal influx in spam.

21             So to the extent we do provide the list, it needs

22   to be subject to a protective order and only used for

23   suppression purposes.

24             THE COURT:  I understand what you're saying.

25             MR. CAMERON:  So to answer this Court's question,

1     what we're really asking and we can tailor a TRO to be very

2     limited in scope, which includes the identification from

3     XMission of the domains we want suppressed and a requirement

4     that Adknowledge suppress those.  And it should, if we

5     comply with the law, if we're set up the way the law

6     intends, stop the e-mails.  This absolutely does not require

7     XMission to shut its entire business -- excuse me,

8     Adknowledge to shut down its entire business.  If it does,

9     as I stated, they exist in perpetual violation of the law.

10    The business should be shut down.  But that would be the

11    subject for a preliminary injunction instead of a TRO.

12          We can tailor a TRO to restrain them from sending

13    an e-mail to those domains for ten days, or until we have an

14    evidentiary hearing and a ruling on the preliminary

15    injunction.  And we can modify the order -- and I don't know

16    that we've submitted our proposed order to the Court.  We

17    drafted it.  I'm not sure if we got it filed last night.

18          MR. SCHMUTZ:  If I may say, Your Honor, we did

19    draft that.  And then we received the pleadings last night

20    and we failed to limit it appropriately.  We needed to

21    revise it.  So we'll need to revise that and send it in.

22          MR. CAMERON:  To that point, we believe that it

23    could be and should be easily achievable.  We're not asking

24    for more than what the law already affords us.  In fact, it

25    should be noted that the law, and case law developed

1    thereunder, prohibits parties from requiring payment to

2    unsubscribe or other mechanisms.  Historically Adknowledge

3    doesn't do this.  We're not accusing them of this.  There

4    have been situations where in order to opt somebody out, you

5    have to pay a fee.

6           To require a bond would almost impose a similar

7    restriction on XMission.  When all XMission wants to do is

8    unsubscribe within its rights, it shouldn't be required to

9    post a bond to do that.  The law doesn't require it.

10          Your Honor, if I may, there are two or three other

11   points I would like to address that I think are responsive

12   to this Court's questions and I apologize if I've taken more

13   time than --

14          THE COURT:  No.  This is important and I will

15   certainly hear Adknowledge and everything they wish to tell

16   me too.

17          MR. CAMERON:  Of course.

18          There are various contradictions and

19   inconsistencies that exist within Adknowledge's memorandum

20   and their declarations which are material and which directly

21   relate to particularly the procurement argument, but also to

22   XMission's efforts to get these e-mails to stop.

23          Specifically, Adknowledge argues that it polices

24   its network sufficiently to prevent violations of the law,

25   but also admits that in order to stop the e-mails, it has to

1    shut down its entire business.  I've discussed that.

2            Adknowledge claims that it received no notice from

3    XMission, but admits -- does not contest that XMission has

4    tried to unsubscribe from every single one of the e-mails.

5    The law does not require notice.  The law gives XMission and

6    its recipients an option to unsubscribe, which option

7    they've attempted to exercise.  To state that XMission is

8    somehow abusing the system and failed to give notice is

9    simply inaccurate and also inconsistent with what

10   Adknowledge has admitted.

11           Adknowledge claims in one part of its brief that

12   it doesn't pay for e-mails, but then it admits that it

13   actually does pay every time its links are clicked in the

14   e-mails.  There's no other way to get those links clicked

15   unless the e-mails are sent.  By incentivizing the clicks in

16   the e-mails, Adknowledge is causing those e-mails to be sent

17   whether the links are clicked or not.

18           Adknowledge claims that it verifies and confirms

19   compliance with the law.  This is important.  This directly

20   relates to procurement.  But it admits, and this is a

21   statement from both declarations, I believe, that it has no

22   knowledge, right or control over the publisher's actions.

23   How can it verify and confirm that its publishers comply

24   with the law if in sworn statement it has no knowledge of

25   what its publishers are doing?  And it also says, we don't

1    even know if the publisher sends the e-mails or not.  That's

2    in the declaration of Mr. Hoggatt -- I'm not sure how to say

3    it -- paragraph 19.

4            If, in fact, Adknowledge has no knowledge of what

5    its publishers are doing, doesn't control it, and doesn't

6    even know if the e-mails are being sent, how then can it

7    verify and confirm that those e-mails are complying with the

8    law?  It can't.  In other words, Adknowledge has no idea of

9    what its publishers do, but every time one of the links is

10   clicked in the e-mail, they make sure to pay a commission.

11   That's the purpose of this business.

12           Adknowledge claims that it only sends to

13   recipients who consented to receive the e-mails, but it

14   admits that Adknowledge has attempted to opt out and it's

15   still sending.

16           THE COURT:  Say that again.

17           MR. CAMERON:  Adknowledge claims that it only

18   sends e-mails to recipients who have consented to receive

19   them, but it does not contest the fact that XMission has

20   attempted to unsubscribe from all of them when it continues

21   to send e-mails.  Clearly, consent is not given.  And

22   consent -- a firm consent, as defined under the law, is a

23   separate analysis for a separate day, but it's worth

24   pointing out, Your Honor, that Adknowledge attempts to rely

25   on consent, consensual e-mails, solicited e-mails with a

1   very broad brush.

2           If this Court analyzes the statute, under Section

3   7704(a)(5)(B), it specifically says to what extent

4   affirmative consent plays a role within the context of the

5   CAN-SPAM Act.  And all it says is that where a party gives

6   affirmative consent, violations of Section 7704(a)(5) are

7   not actionable.  We do not allege any violations of

8   7704(a)(5).  So to the extent the parties did give

9   affirmative consent is irrelevant where we're not alleging

10  violations of the specific provision to which a firm consent

11  applies.

12          A firm consent also applies to sexually explicit

13  messages.  We haven't alleged any sexually explicit messages

14  here, and the argument is irrelevant.

15          Adknowledge claims that it reacts promptly to

16  opt-out requests, yet argues that in order to stop

17  XMission's e-mails, it has to shut down its entire business.

18  Adknowledge claims that the publishers control and maintain

19  relationship with the recipients, but then states that it

20  has a database of 600 million people to which it directs

21  messages and it also has the ability to target -- and target

22  is the operative word here -- two billion people in 50

23  different countries.  If, in fact, the publishers control

24  all of that, how does then Adknowledge have a database of

25  600 million and the ability to target on its own two billion

1   people?

2           THE COURT:  Let me back up one sec.  Adknowledge

3   says that it reacts promptly to opt-out requests.  And you

4   say that the way that you were able to find out that

5   Adknowledge was involved with certain of these e-mails is

6   because the unsubscribe link went back to Adknowledge,

7   right?

8           MR. CAMERON:  Let me clarify that point, Your

9   Honor.  I appreciate the question.  If I may direct this

10  Court's attention to another exhibit, this will help to

11  clarify.

12          This is Exhibit 1 to the declaration of

13  Mr. Ashdown.  This is what we've designated as sample

14  redirect report.

15          Technical difficulties.  I apologize.

16          THE COURT:  Don't blame you a bit.

17          MR. CAMERON:  What we have identified in this

18  summary of evidence is the e-mail identified by control ID

19  number, the time and date that it was received, and the link

20  that was in the e-mail itself that identifies Adknowledge.

21  If you go through, you can see all of these.  In some

22  e-mails, there are a whole slew of links that identify

23  Adknowledge.  In others, they are more limited.

24          This is what we call a terse report.  This only is

25  showing us a small piece of the actual report.  The purpose

1   for that is we submitted ten pages.  The full terse report

2   is 9,000 pages long.

3            THE COURT:  How do you spell that word?

4            MR. CAMERON:  I call it t-e-r-s-e.

5            THE COURT:  Like terse?

6            MR. CAMERON:  I don't know where that came from.

7   Somehow this got designated along the way.  That's what we

8   call it.

9            The complete report, if we were to include and

10  demonstrate to the Court, which we have the data to provide,

11  all of the unsubscribe links as well, would encompass -- I

12  mean we're talking 65,000 e-mails, multiple links and

13  e-mails, this could be 65,000 pages long.  We've had reports

14  that are hundreds of thousands of pages long.

15           THE COURT:  Okay.  So just, shorthand, simplify.

16  If I get a spam message that supposedly or must have, under

17  law, some way for me to unsubscribe, what's it going to look

18  like, the link where I'm --

19           MR. CAMERON:  It can look like a variety of

20  things.  It can say if you wish to opt out, click here, and

21  you just click.  If you wish to unsubscribe, you click the

22  unsubscribe button.  There's no specific requirement under

23  the law of how it's supposed to look.

24           What the law requires is that it is clearly and

25  conspicuously displayed and that it remains active for 30

1    days.

2              THE COURT:  And that link, the unsubscribe link,

3    whatever it might look like, how does that relate to those

4    terse messages you're showing me?

5              MR. CAMERON:  That does not directly relate to

6    what I'm showing you on the screen.  What I'm showing you on

7    the screen is simply an exemplary sample of what the links

8    look like when they are expanded that exist in the e-mails.

9              THE COURT:  So when you say expanded, what do you

10   do?

11             MR. CAMERON:  When you receive an e-mail, you get

12   a picture, and you click the picture and it takes you to the

13   Web site.  You don't see what's behind it.  You don't see

14   essentially the guy that's directing traffic, telling it

15   where to go.  When you click that link, you then record

16   what's called a redirect link.  And what it does is upon

17   click, all of the information that is entered automatically

18   is recorded in a successive link until that e-mail arrives

19   at its destination, and then it stops.

20             THE COURT:  So are you telling me that for each

21   simple redirect link that a user might get, if she or he

22   clicks on it, ultimately the behind-the-scenes data will

23   look like these?

24             MR. CAMERON:  Exactly.

25             THE COURT:  So it will link to Adknowledge?

1           MR. CAMERON:  It will click through Adknowledge

2    and it will arrive at the advertiser's Web page, or the

3    destined Web page.

4           There are other various important pieces of

5    information here that perhaps I should point out to the

6    Court.

7           THE COURT:  It travels through --

8           MR. CAMERON:  It travels through, and as it --

9           THE COURT:  It travels through Adknowledge?

10          MR. CAMERON:  Right.  As admitted in their

11   briefing, they do this so they can track every click because

12   if they don't, they don't get paid and they don't know how

13   to pay their publishers.  So it has to route through

14   Adknowledge for them to have knowledge that these are their

15   e-mails that are successful that are being clicked.

16          THE COURT:  Let me just stop you there.  What

17   travels through Adknowledge when every time a potential

18   consumer clicks onto the spam in her or his mailbox or when

19   the consumer says unsubscribe?

20          MR. CAMERON:  With respect to the unsubscribe,

21   they can provide more information on that, and I can address

22   it based off of my knowledge of the industry.  But let me

23   explain what we're seeing here.

24          THE COURT:  This has to be behind every e-mail so

25   that you say Adknowledge can keep score of what it's owed

1    and what it needs to pay the publisher because it's paid

2    when there's a click on and it pays the publisher?

3              MR. CAMERON:  Exactly.  So you don't see any of

4    this.  And if this doesn't exist, than you click on the link

5    and it goes nowhere, nothing happens.  We've all had that

6    happen where you get an e-mail and it's old and it says

7    click this link and you click and it doesn't go anywhere.

8    That's because this link has been terminated.  It no longer

9    exists.

10             There are situations where you can click on a link

11   and it goes directly to an advertiser's Web site and it

12   doesn't identify Adknowledge, it doesn't identify a

13   publisher, it doesn't identify a marketer.  In that case,

14   we're not talking about those e-mails.  The only e-mails

15   we're dealing with here are the ones that identify

16   Adknowledge and, by Adknowledge's own admission, they use to

17   track their progress and to get paid.

18             There's another piece of information that's

19   important here, and I believe that the number that you see

20   after you see adknowledge.com/preferences.php, these

21   actually might be an unsubscribe link based off of the

22   preferences knowledge, but I can't conclusively state that.

23   But what you have, 2092318, these are typically in the

24   business of what we call affiliated IDs.  This is how

25   Adknowledge knows which one of its publishers sent the

 1   e-mail.  Of course 20923180 means nothing to us.  With this

 2   data, we cannot identify a publisher.  Adknowledge can.

 3            With the redirect links that we can provide, every

 4   single one of them, Adknowledge has the ability to identify

 5   every single one of the publishers who's responsible for

 6   that e-mail.

 7            THE COURT:  So let me just make sure that I

 8   understand.  You're saying it really goes back to the way

 9   that Adknowledge is paid and pays.  It has to know -- it has

10   to know the publisher -- it has to know the publisher so it

11   can pay the publisher?

12            MR. CAMERON:  Right, and so it can get paid

13   itself.

14            THE COURT:  So it has to know which publishers.

15   And you're saying that all the affiliated Adknowledge spams,

16   you have tried to unsubscribe unsuccessfully?

17            MR. CAMERON:  Let me clarify the record because I

18   don't want to be accused of misleading the Court.  There are

19   circumstances where unsubscribe links may have been honored,

20   but certainly there are circumstances where they have not

21   because the e-mails continue.

22            THE COURT:  Is it fair to say, then, that what you

23   want is Adknowledge to stop sending all the publishers'

24   e-mails that go through XMission here in Utah?  Is that sort

25   of what you're asking me?

1          MR. CAMERON:  Yes.  So let me clarify one point.

2     The publishers are the ones that are clicking the send

3     button.  What we want Adknowledge to do and what they are

4     obligated to do under the law, under Section 7704(a)(4), is

5     to for themselves suppress the lists.  And in order to do

6     that, they have to tell their -- they publish their

7     suppression list to their publishers.  So their publishers

8     are given a directive and they are required -- I don't know

9     how Adknowledge does it, but this is what is common in the

10    industry and the way it's supposed to work.  They are

11    required to maintain suppression lists and their publishers

12    are required to maintain those suppression lists so that the

13    e-mails will stop.

14         THE COURT:  So we're talking about a suppression

15    list, and that suppression list, you have it?

16         MR. CAMERON:  The suppression list is

17    Adknowledge's.  What we have are the recipient domains that

18    we can give them to put on their master suppression list,

19    which is supposed to stop the e-mails.

20         THE COURT:  But they don't have a suppression list

21    that now includes the e-mails that you say XMission is

22    trying to suppress because it hasn't gone through, or what

23    are you saying?

24         MR. CAMERON:  I don't know if they have them or

25    not.  I believe they state in their brief that they do at

1   least have some of them.  What we're willing to do to

2   facilitate the suppression is provide the complete list.

3           THE COURT:  A suppression list?

4           MR. CAMERON:  A list of our domains that they can

5   include on their suppression list.

6           THE COURT:  That they may include?

7           MR. CAMERON:  Yes, and that they are required to

8   publish to their affiliates to stop the e-mails.

9           THE COURT:  All right.  I understand that.  Go

10  ahead, please.

11          MR. CAMERON:  I have one other point, Your Honor,

12  and this was just another inconsistency that relates to the

13  procurement argument.  In declaration, Adknowledge claimed

14  that it only uses a few select, highly qualified publishers.

15  However, two paragraphs prior to making that statement,

16  Adknowledge admits that it has relationships with

17  innumerable publishers.  It begs the question, innumerable

18  means without number, meaning so many publishers you don't

19  even know how many there are.  Yet two paragraphs later,

20  they say we only select a few highly qualified publishers.

21          I will remind the Court, they have admitted, we

22  have no knowledge or control over what our publishers do.

23  We don't even know if they send e-mails.  This is a complete

24  loss of institutional control, to borrow from the common

25  NCAA vernacular.  This is a situation where there is no

1    attempt, outside of a paper sham, to verify and confirm that

2    these publishers are complying with the law because they

3    can't do it, they don't even know who they are, they're

4    innumerable, they don't have control over it, they don't

5    have knowledge of what goes on.  They simply pay when the

6    links are clicked.  And that business induces violations of

7    the law.  They are responsible for that as the procurer.

8           They stood on the mountain, they pushed the

9    boulder down, they are watching it fall.  And now when they

10   are requested to stop it, they want sympathy of the Court

11   because if they stand in front of that boulder, they are

12   going to get squashed.  The Court should not have sympathy

13   on them, Your Honor.

14          THE COURT:  Thank you.

15          Let's take about a five- or ten-minute break and

16   then hear from you, counsel.

17          (Recess)

18          THE COURT:  Ready to go, Mr. Newman?

19          MR. NEWMAN:  Good morning, Your Honor.  May it

20   please the Court, my name is Derek Newman.  I represent

21   Adknowledge, Inc.

22          XMission's statement of the facts in this case are

23   largely incorrect.  They are not supported by any evidence

24   and the reason why is because they're just false.  I think

25   there are only two statements of fact that were true.  The

1     first is Adknowledge didn't send any e-mails.  The

2     publishers sent the e-mails.  The second, which is true, is

3     Adknowledge tracks commissions for advertisers and so a link

4     Adknowledge has appears in the e-mails.  Those are the only

5     two facts --

6               THE COURT:  Do you also pay publishers?

7               MR. NEWMAN:  Yes, Your Honor.

8               THE COURT:  So you are paid by advertisers for

9     every click?

10              MR. NEWMAN:  Yes, Your Honor.

11              THE COURT:  And then you pay publishers for every

12    click, right?

13              MR. NEWMAN:  Yes, Your Honor, except the

14    publishers send the e-mail regardless of whether Adknowledge

15    places a link in the e-mail.

16              These publishers all have prior preexisting

17    relationships with their customers.  They regularly send

18    their customers e-mail.  Adknowledge may place a link and

19    then is entitled to a commission if there's a click, pays

20    the advertiser, but if Adknowledge does not place the link,

21    the e-mail is still sent.

22              THE COURT:  Let me just ask you, then, but you are

23    paid by the advertiser for each click, you told me, and then

24    you pay the publisher for each click?

25              MR. NEWMAN:  Yes, Your Honor.

1           THE COURT:  If the publisher and the advertiser

2     have the relationship and the publisher can send the e-mail

3     and needs nothing from you, why are you even in the chain?

4           MR. NEWMAN:  Because Adknowledge has

5     relationships.

6           THE COURT:  With?

7           MR. NEWMAN:  With advertisers.  In fact, half of

8     the Fortune 500, Volkswagen, L'Oreal, amazon.com, Land

9     Rover.  Substantial relationships with advertisers, and with

10    publishers.  And these publishers aren't just e-mail

11    publishers.  They publish on YouTube, a video channel.

12          THE COURT:  Let me stop you.  So from your first

13    statement I sort of gather, but I guess that's wrong, that

14    you're not needed, that even if you weren't in the chain,

15    the publishers and the advertisers could make the

16    arrangement to send the e-mail to the user through XMission

17    without you?  But your role is, from what you tell me, which

18    is the truer, that you have the existing -- that you have

19    the relationship with the advertisers and the publishers or

20    you're really not needed?

21          MR. NEWMAN:  Adknowledge has a relationship with

22    the advertiser and the publisher.  Your Honor asked whether

23    the publisher and the advertiser could get together without

24    Adknowledge.  The answer is yes, but the publisher probably

25    doesn't know the advertiser and because Volkswagen doesn't

1    do business with just anybody.  And the publisher, the Court

2    should note, sends the e-mail regardless.  And I'll give the

3    Court an example of the type of e-mail it sends.

4              THE COURT:  Regardless of what?

5              MR. NEWMAN:  For example, a publisher may be an

6    electronics retailer like BestBuy.  And the consumer has

7    requested that BestBuy send it regular updates about

8    products that are on sale and the like.  BestBuy can also

9    include advertisements in the e-mail it already sends on

10   behalf of others.  BestBuy may have a direct relationship

11   with an advertiser and it will do that deal directly or it

12   may use Adknowledge's services where Adknowledge connects

13   the advertiser with the publisher and the advertisement is

14   placed.  Adknowledge doesn't send the e-mail and if

15   Adknowledge were to terminate its business, the e-mails

16   would still be sent.

17             THE COURT:  Wait.  Wait.  Wait.  The e-mails would

18   be sent by the publisher?

19             MR. NEWMAN:  Yes, Your Honor, because the

20   publisher already has relationships with consumers and it

21   sends these consumers e-mails.  And Adknowledge, through a

22   substantial vetting process to make sure publishers are

23   reputable and complying with laws, enters into relationships

24   with publishers to provide the opportunity to run

25   advertisements for these big companies that do deals with

1   Adknowledge.

2          THE COURT:  But how do you keep track of when an

3   advertiser owes you for a click and when you must then pay a

4   publisher?

5          MR. NEWMAN:  Adknowledge provides the publisher

6   the link which was displayed in the exhibit that XMission

7   displayed.  And that's one of many links.  It's not the only

8   link.  There's other links to other products.  In the

9   BestBuy example, it might be to BestBuy, it might be to

10  another advertiser, or it might be to an advertiser that

11  Adknowledge has referred.  Adknowledge provides the link to

12  the publisher.  The user says, oh, I'm interested in that

13  product, clicks on the link, and that sends a message to

14  Adknowledge that there's been a click.  So it records the

15  click.  After the click is made, the user is directed to the

16  advertiser's Web site.

17         So, for example, GEICO, the large insurance

18  company, is one of Adknowledge's advertisers and GEICO will

19  enter into an agreement with Adknowledge to find

20  impressions, meaning consumers' views.

21         THE COURT:  Say that word again.

22         MR. NEWMAN:  The word is impression.  It's an

23  advertising term.

24         So every time a consumer sees something that is of

25  marketing or advertising value, advertisers call that an

1    impression.  When ads are placed, they're usually for

2    impressions.  You pay for consumer impressions.

3            So GEICO wants more impressions because it wants

4    to sell more insurance and it advertises on TV.  The Court

5    has probably seen GIECO's ads.  It's a large advertiser with

6    Adknowledge.  So Adknowledge will place a GEICO ad with a

7    publisher.  What that is is the link that XMission

8    displayed.  It will go in an e-mail that is going to be sent

9    in any event.  They might have other ads.  Usually, almost

10   always has other ads.  It's not just limited to this one

11   advertisement that Adknowledge places.  And to the extent

12   that ad is placed, the consumer clicks on the link,

13   Adknowledge can track it because it sends a message to

14   Adknowledge saying click, and then GEICO receives an

15   impression, user traffic.

16           THE COURT:  For each click, Adknowledge is paid

17   and then the publisher is paid?

18           MR. NEWMAN:  Yes, Your Honor.  GEICO pays

19   Adknowledge, Adknowledge retains a fee and pays the balance

20   to the publisher.

21           THE COURT:  So when you say you have no control

22   over the publisher, you must have some kind of control

23   because if they're doing something illegal, you don't have

24   to pay them?

25           MR. NEWMAN:  Yes, Your Honor.

 1              May I take a step back?

 2              THE COURT:  Please step back.

 3              MR. NEWMAN:  Thank you.

 4          I would like to tell you about Adknowledge's

 5   business just a little bit, and it's in our memorandum and

 6   in the supporting declarations, and I hope the Court will

 7   have the opportunity to read them.

 8              THE COURT:  The Court has read them, but the Court

 9   needs help.

10              MR. NEWMAN:  Thank you.  I would love the

11   opportunity to provide that help.

12              THE COURT:  That's why we're here.

13              MR. NEWMAN:  Adknowledge is a large company.  It

14   is fourth in the world behind three other ad networks,

15   Google, Yahoo, Microsoft, and then comes Adknowledge.

16   Adknowledge connects advertisers with publishers.

17   Publishers are not limited to e-mail marketers.  They might

18   be mobile games that you play on your phone.  They might be

19   a video channel on YouTube.  It might be a blog.  It might

20   be a Web site.  Adknowledge has these relationships, lots of

21   relationships.

22              So Google, for example, has the eyes of ten

23   billion consumers, or the like.  Adknowledge has the eyes of

24   two billion consumers.  XMission cited that.  That's not

25   e-mail marketing.  That's its entire network that it has

1    built.

2            One type of marketing that it does and it's very

3    good at is connecting advertisers with e-mail publishers.

4    The reason it's so good at that is Adknowledge has robust

5    terms and conditions, practices and policies, and

6    agreements.  It requires every publisher to agree to certain

7    things.

8            THE COURT:  Let's just stop right there.  I have

9    no doubt but that you do impose certain rules upon your

10   publishers and many of those rules are written in light of

11   the law.  And one of the laws -- provisions of the law is

12   that when an e-mail recipient or someone authorized to act

13   on behalf of the recipient says unsubscribe, I don't want to

14   see any more, it will happen, right?

15           MR. NEWMAN:  Yes, Your Honor.

16           THE COURT:  But it isn't?

17           MR. NEWMAN:  That's not true.  In fact, XMission

18   said that Adknowledge admitted it received unsubscribe

19   requests.  That's just false.  And XMission said that

20   unsubscribe links didn't work.  That's false too.  We tested

21   them.

22           THE COURT:  How do you know that?

23           MR. NEWMAN:  Because XMission provided in its

24   papers some of these links and Adknowledge tested them and

25   they were successful.

1          Now the unsubscribe links, Your Honor, aren't

2    Adknowledge's unsubscribe links.  So to the extent that the

3    unsubscribes were made to Adknowledge, that wouldn't stop

4    the publisher from sending e-mails.  They're the publisher's

5    unsubscribe links.

6          THE COURT:  Stop just there.  Do you receive any

7    notification of an unsubscribe request?

8          MR. NEWMAN:  Your Honor, there are two types of

9    unsubscribes with respect to Adknowledge's services.  One,

10   Adknowledge doesn't control.  That's the publisher's

11   unsubscribe link.  That's the link that appears in the

12   e-mail.  To the extent that XMission is clicking on links,

13   it doesn't flow through Adknowledge.  Adknowledge doesn't

14   control it.

15         But Adknowledge, as I said, has rigorous

16   practices, policies and procedures, and it maintains a

17   suppression list that XMission discussed.  And it deploys

18   that suppression list to every one of its publishers and

19   what that does is it doesn't stop e-mails, because

20   Adknowledge can't do that, it doesn't send the e-mails, but

21   it stops the publishers from sending any Adknowledge

22   advertisements to anyone on the list.  So XMission still

23   receives the spam.  It just won't have Adknowledge's link.

24         And, Your Honor --

25         THE COURT:  Let me just stop you here.

1   Adknowledge says it has attempted to unsubscribe.  However,

2   those e-mails continue to come.

3           MR. NEWMAN:  That's false.

4           THE COURT:  That's totally false?

5           MR. NEWMAN:  Totally false.  Totally false.

6           THE COURT:  See, I have trouble when you say that

7   because I think there might be a misunderstanding.  But I

8   cannot accept that an attorney gets up here and tells me it

9   doesn't work.

10          MR. NEWMAN:  I never said that.

11          THE COURT:  Then what did you mean by that is

12  false?

13          MR. NEWMAN:  Your Honor, Adknowledge has not

14  received unsubscribes that were unsuccessful.  That never

15  happened.  Every unsubscribe that Adknowledge receives

16  through its system is successful.  To the extent that it's

17  not, it's promptly reported and Adknowledge takes swift

18  action against the publisher by finding it, putting it into

19  compliance if there's a technical issue, for example, or

20  terminating it.

21          THE COURT:  How do you explain -- because I don't

22  think XMission has gone to this trouble and has its attorney

23  up here to tell me that they can't unsubscribe if that isn't

24  happening.  What is your explanation for what's happening?

25          MR. NEWMAN:  Why is XMission here today?

1                    THE COURT:  Well, why when they say, when I am

2       told we have attempted to unsubscribe and it is

3       unsuccessful, what is happening?

4                    MR. NEWMAN:  I think that the statistics that

5       XMission submits provide some light on it.

6                    THE COURT:  Tell me, then.

7                    MR. NEWMAN:  XMission shows that in January, for

8       example, it received 100,000 or so e-mails and only 16

9       complaints.  And over the months following January, the

10      e-mails decreased and the complaints increased.  It seems

11      like a systematic scheme that XMission has developed.

12                   THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.

13      What are you telling me, that when I am told by Mr. Cameron

14      that they have received 6,000 complaints, that is untrue?

15                   MR. NEWMAN:  I think the complaints might be

16      automated.  But, Your Honor, Adknowledge never received any

17      complaints.  XMission --

18                   THE COURT:  No, they wouldn't.

19                   MR. NEWMAN:  Well, they should have.

20                   THE COURT:  Why?

21                   MR. NEWMAN:  Because in January, according to the

22      papers that XMission filed, it surreptitiously started

23      collecting e-mails without making a complaint to anyone.

24      When it saw the Adknowledge link in January, it could have

25      called up Adknowledge and provided these domain names it was

```
 1    talking about and said to add it to your suppression list.
 2    What would have happened is the e-mails would not have
 3    stopped flowing because the publishers still send them, but
 4    they would not have had Adknowledge's links in them.
 5                THE COURT:  Let me just ask you, though, if you
 6    received the list --
 7                MR. NEWMAN:  Which list?
 8                THE COURT:  -- that Mr. Cameron proposes giving
 9    you -- is it the domain names?
10                MR. CAMERON:  Yes.  The recipient domain name
11    list.
12                MR. NEWMAN:  I understand that, Your Honor.
13                THE COURT:  If you received these recipient domain
14    lists and I were to say you tell -- and those are linked to
15    publishers; am I correct, counsel?
16                MR. NEWMAN:  No, Your Honor.
17                THE COURT:  To whom are they linked?
18                MR. NEWMAN:  The domain names are linked to
19    XMission's customers.
20                THE COURT:  Right, but --
21                MR. CAMERON:  Your Honor, if I may clarify?
22                THE COURT:  Sure.  Please do.
23                MR. CAMERON:  The domain names are XMission's,
24    XMission's customer link.  I believe what you're referring
25    to is the suppression list which is published to the
```

1    affiliate publishers.  If I'm understanding the Court

2    correctly, the question is if we provide our domain list,

3    does he have the ability to put it on their suppression list

4    and publish it to their publishers?

5                 THE COURT:  Yes, and that's better phrased.  Could

6    you do so?

7                 MR. NEWMAN:  Yes.  But Your Honor didn't ask about

8    the effect of that.  The effect of that would not be

9    stopping any e-mails.  The effect would mean that

10   Adknowledge's ads don't appear in the e-mails.  XMission

11   would still receive the e-mails.

12                THE COURT:  XMission's ads would not appear in the

13   e-mails?  In other words, you wouldn't get paid for those

14   e-mails?

15                MR. NEWMAN:  Well, Adknowledge is never paid for

16   e-mails.  Adknowledge is paid for impressions.

17                THE COURT:  So would you still get paid?

18                MR. NEWMAN:  No, because the ad wouldn't appear.

19                THE COURT:  You wouldn't get paid and you wouldn't

20   pay?

21                MR. NEWMAN:  Gladly, because Adknowledge has a

22   robust suppression list and a compliance department with

23   full-time employees to ensure no violations.  To the extent

24   that anyone complains ever, that's added to the suppression

25   list and it's deployed to the publishers.

1           THE COURT:  Well, then, what's the harm to you to

2   provide under a suitable protective order the domain list,

3   tell your publishers none of our ads go to those domain

4   lists, you won't be paid for them, and what would be the

5   problem with that?  How would you be harmed?

6           MR. NEWMAN:  Well, I can see two points of harm.

7           THE COURT:  Okay.  Tell me.

8           MR. NEWMAN:  The first point, which is much more

9   important than the second, is if a TRO issues against

10  Adknowledge, because of its size, it's going to get sued

11  every day by plaintiffs that want to collect $250 per

12  e-mail, just as XMission does.  That type of stain on its

13  record means that advertisers aren't going to advertise with

14  it and publishers aren't going to accept its ads.  The TRO

15  impact to Adknowledge's business is substantial.

16          THE COURT:  Then let me ask you this, and I

17  understand that.  What is the problem with a stipulated

18  agreement?

19          MR. NEWMAN:  None.  Your Honor, if they would have

20  provided this list, Adknowledge would have added it to the

21  suppression list, and I don't know what their argument would

22  be today.  I think they would still be here.  I believe it's

23  for a strategic purpose.

24          THE COURT:  Why don't we try that to see if there

25  is a stipulation and a protective order until we get this in

1    a place where we can have a full evidentiary hearing.

2    Adknowledge then avoids what you call the taint, I think, of

3    a TRO, and XMission receives relief.

4            MR. NEWMAN:  It doesn't really receive relief

5    because it's going to receive e-mails.  They're just not

6    going to have Adknowledge links on them.

7            THE COURT:  How would you feel about that?

8            MR. CAMERON:  Your Honor, I think we could

9    probably reach a stipulation.  We would prefer to submit it

10   in the form of a stipulated TRO that requires them --

11           THE COURT:  Except if I said -- you know, nobody

12   likes to be enjoined and I, frankly, don't like to enjoin,

13   although I certainly will unless I have all the evidence in

14   front of me.  What's the problem with this list being with

15   very rigorous protections for both sides, I give Adknowledge

16   the protection and you avoid a TRO?  It just shows what a

17   good company you are by entering into a stipulation, and you

18   won't disclose, and you can understand the harm that could

19   flow to XMission.  XMission, you get all the relief you want

20   and we avoid a TRO, and you get them stopping.  They say

21   you're still going to get the e-mails, we just won't have

22   our advertisers in them.  How would you feel about that?

23           MR. CAMERON:  There are two points, Your Honor,

24   and I will have an opportunity to rebut.  I believe there

25   are various inconsistent statements that have been made and

1   would provide some clarification if those statements were

2   clarified.

3          To the Court's point, though, we would not be

4   resistant to a stipulated order.  We do argue that it has to

5   be an order of the Court.  The reason for that is --

6          THE COURT:  I would order that this stipulation --

7   pursuant to the stipulation, this is my order, but it's not

8   a TRO.

9          MR. CAMERON:  But to the extent it enters as an

10  order of this Court, then we believe that we have available

11  recourse if it is violated.

12         THE COURT:  True.

13         MR. CAMERON:  If it's simply a stipulation between

14  parties, Mr. Newman has been up here telling you all the

15  reasons why they can't stop the e-mail.  If that's true and

16  we simply reach an agreement, then all we have is a breach

17  of contract claim and we have to initiate another lawsuit

18  and we have to go through this process all over again.

19         THE COURT:  Well, no, you have a contempt --

20         MR. CAMERON:  Well, if it's an order of the Court

21  is what I'm saying, which is why it must be an order of the

22  Court.

23         MR. NEWMAN:  Your Honor, had XMission contacted

24  Adknowledge and asked for these domain names to be added to

25  the suppression list, Adknowledge would have done that.

1    XMission would still be here, it would have a different

2    argument because I don't believe that its motives here are

3    in good faith.  And I also anticipate that if an order

4    issues, they're going to seek contempt if they receive

5    something, even though Adknowledge is going to fully comply,

6    as it would even if there wasn't an order, to add the domain

7    names to its suppression list.

8            The reality is is this TRO was brought in bad

9    faith.  XMission never contacted Adknowledge --

10           THE COURT:  You know what, Mr. Newman, I really

11   don't like to hear those sorts of claims.  I've been doing

12   this 20 years and it's very rarely that I run into bad faith

13   things.

14           MR. NEWMAN:  XMission didn't even serve its

15   complaint when it filed the lawsuit weeks ago.

16           THE COURT:  They had some problems here.  But

17   rather than making these claims of bad faith -- maybe I'm

18   just naive, maybe my 20 years here, 14 years as a prosecutor

19   still left me unbelievably naive, but what I'm going to do

20   is -- do you think, given all the language that's been

21   discussed and bandied about here, do you think, Mr. Cameron,

22   that you and Mr. Newman, and perhaps Ms. English, and you,

23   Mr. Schmutz, do you think you can sit down and craft an

24   order that would give them the relief, you the relief that

25   would be for my signature and would avoid the taint of a

1    TRO, and then we could set this down for an evidentiary

2    hearing?  How do you feel about that, Mr. Cameron?

3              MR. CAMERON:  Your Honor, we're certainly willing

4    to try.

5              THE COURT:  How about you, Mr. Newman?

6              MR. NEWMAN:  Your Honor, I'm concerned about the

7    idea that there's contempt sanctions.  Adknowledge is

8    suspicious of XMission, even though the Court is not, and

9    that's fair.  And I have experience with my colleagues who

10   represent XMission and I think they are fantastic lawyers.

11   I like them and I'm looking forward to working with them in

12   this case.

13             The reality is is they never contacted

14   Adknowledge.  They do not have a likelihood of success on

15   the merits.  Adknowledge has rigorous policies in place that

16   they police.

17             THE COURT:  Then let me tell you this.  From what

18   I've heard, there seems to be, whether you have your

19   rigorous policies in place or not, something slipping

20   through.  And it might be that you've got some rogue

21   publishers or something that's not working, et cetera.  I

22   don't know.  But when I get these sorts of declarations --

23   and I have read your declarations as well, and I know you

24   have these policies -- I have to believe that some spam is

25   slipping through.  I want to stop it.  I want to stop it

 1   permanently if it's in violation of the Act.  But I truly

 2   won't know fully until I have a full evidentiary hearing.

 3            Now I know you worry about contempt, but it is not

 4   easy to prove contempt.  And before I would impose contempt

 5   sanctions, which I've done very little of in my life, we

 6   would have to have what is clear and convincing, and all

 7   that sort of stuff.  Do you want to try and work this out

 8   with XMission's attorneys or do I just hear you on the

 9   merits, knowing that it's either going to be a TRO or no

10   TRO?

11            MR. NEWMAN:  Thank you for the opportunity to

12   select.  Your Honor, may I confer with my client?

13   Adknowledge's chief legal officer is in the room.

14            THE COURT:  Sure.  Let's take about five or ten,

15   or whatever time you need.

16            MR. NEWMAN:  I think I need five minutes.

17            THE COURT:  Five minutes you've got.

18            MR. NEWMAN:  Thank you, Your Honor.

19            (Recess)

20            THE COURT:  Before we go forward, I would like to

21   clarify on the possible conflict.  Ms. Rice tells me she

22   doesn't think she's ever received spam on XMission, she's

23   certainly never unsubscribed, and she's certainly never

24   complained.  There you go.

25            So what's the plan, Mr. Newman?

```
 1              MR. NEWMAN:  Your Honor, thank you for allowing me
 2     the opportunity to confer with my client.  My client advised
 3     exactly what I expected.  And I've spoken with my friend,
 4     Mr. Cameron, who represents XMission, and we would be
 5     pleased to negotiate that stipulation.
 6              THE COURT:  Good.  Let me tell you what I want you
 7     to do.
 8              MR. CAMERON:  Your Honor, if I may?
 9              THE COURT:  Of course.
10              MR. CAMERON:  I apologize.  Before you tell us
11     what you would like us to do, which I assume is dismiss
12     ourselves and see if we can't come to some language, I would
13     like the opportunity to just provide a brief rebuttal before
14     we break to reach a stipulation, which we're willing to
15     attempt to accomplish.
16              THE COURT:  Okay.  And then you can rebut that if
17     you want.  So let's hear that.  But here's what I'm thinking
18     we're going to do.  I'm going to keep a close watch on what
19     the language is.  And if you can't agree upon the language,
20     don't go far because we'll work it out together.  Once we
21     reach the agreement, whether it's -- it should simply say
22     that -- I don't want to let my lack of expertise intrude,
23     but that you will inform all your publishers who use certain
24     domain names not to send them to these domain names.
25              MR. NEWMAN:  Your Honor, that's technically
```

1    incorrect.

2              THE COURT:  That's the gist of it, but you make it

3    happen the way it's supposed to happen.

4              MR. NEWMAN:  I think Mr. Cameron and I understand

5    what's technically correct and we'll negotiate the correct

6    language.

7              THE COURT:  Right, because I'm certainly -- I'm

8    not in this business.  And then, as far as your fears, if

9    you've got a publisher who ignores what you say or makes a

10   mistake, that's not going to be contempt.  Contempt has to

11   be knowingly, that you didn't tell your publisher or that it

12   was a bad faith mistake, because I'm not in the business of

13   finding in contempt.  But let me hear from you.

14             MR. CAMERON:  Your Honor, just a few minor points.

15   I would like to borrow from Mr. Newman's own description of

16   his services.  He indicates that they represent Volkswagen

17   as one of their advertisers, and they bring these parties

18   together, Volkswagen as the advertiser on one side and the

19   publisher is on the other side, and has admitted and stated

20   that if he steps out of this, Volkswagen doesn't just deal

21   with anybody.  But has inconsistently stated that if they do

22   step out of this, the e-mails will continue.

23             THE COURT:  The e-mails might continue, but

24   Volkswagen won't be one of the advertisers in the e-mail.

25             MR. CAMERON:  That's my exact point, which is that

1    Adknowledge controls the advertiser relationships, they

2    control the publisher relationships, they bring these

3    together.  It should be squarely within their control to

4    stop all e-mails.

5              THE COURT:  As I understand it, and, again, as

6    Mr. Newman pointed out, I technologically am a little

7    unsound, do the publishers send spam messages that maybe

8    have advertisements from several advertisers?

9              MR. CAMERON:  They may and they may not.  They

10   certainly do in some circumstances.

11             THE COURT:  Is that what you were referring to

12   when you said the e-mails won't stop?

13             MR. NEWMAN:  Your Honor, Adknowledge is like an

14   advertising agency.  If it places an ad for Volkswagen in

15   The New York Times, Adknowledge gets a commission and so

16   does Volkswagen.  If it doesn't, The New York Times is still

17   delivered.  It just might not have Volkswagen's ad, or

18   perhaps with another agency.  Adknowledge can't stop The New

19   York Times from being delivered.  It can only stop the ads

20   that it places.

21             MR. CAMERON:  Thank you, Derek, because that's my

22   exact point.  We believe that for a stipulated order to

23   work, it must designate that XMission will not receive

24   e-mails with Adknowledge links in them because, as he says,

25   the e-mails may be delivered, and that's true.  But if they

1    are, they're not going to be attributable to Adknowledge and

2    they're not going to contain advertisements for

3    Adknowledge's advertisers, which is the reason we're here.

4    If we get e-mails, we can take those up with them and the

5    other party is responsible.

6            THE COURT:  How does that work?  That seems pretty

7    narrow.

8            MR. NEWMAN:  Well, that doesn't work, Your Honor,

9    because to the extent that an Adknowledge link appears, it's

10   as a consequence of a publisher that wasn't acting properly.

11   Perhaps we can negotiate in consequences like, for

12   example -- I'm just thinking off the top which is unfair

13   because I haven't spoken to my client, but maybe something

14   with the commission or maybe actions taken against the

15   publisher, or maybe the publisher is disclosed to XMission

16   so XMission can take direct action.  But all Adknowledge can

17   control is the ads it places.  It can't control when the

18   publisher disregards policies and directives.

19           MR. CAMERON:  I agree with that.  But my point is,

20   and I think this Court has addressed that, it's a clear and

21   convincing standard of proof for contempt.  If one, two, ten

22   e-mails slip through with Adknowledge's links, that's not

23   contemptible.  If 65,000 e-mails come through with

24   Adknowledge's links, I believe we would have clear and

25   convincing evidence.  We're not willing to agree to an

1    alternative method to pursue a publisher who may be Joe

2    James in a dorm room at U.C.L.A. sending e-mails.  We'll

3    never find him.  We'll never get anywhere.  We'll never stop

4    anything from that kid.  But that's not the point.

5            Adknowledge controls the relationships.  They are

6    the procurer.  The only possible procurer is Adknowledge in

7    this situation.  It should be possible and the order should

8    dictate we don't receive any e-mails with Adknowledge links.

9    If there are one or two, or ten or 15, it's not

10   contemptible.  If there's 65,000, we've got an issue.

11           THE COURT:  Well, the best they can do is they

12   tell their publishers don't send them to XMission.  You

13   won't be paid and you're risking sanctions.

14           MR. CAMERON:  I believe that's partially accurate

15   and almost complete.  And of course the technological aspect

16   of it Mr. Newman and I can discuss.

17           THE COURT:  Let's make a stab at it.  Do it in

18   good faith.

19           I trust, just to clear up my belief and maybe

20   clear up Mr. Newman's belief, you didn't knowingly

21   misrepresent anything to me up here, did you?

22           MR. CAMERON:  No.  Absolutely not, Your Honor.

23           THE COURT:  All right.

24           MR. NEWMAN:  Your Honor, may I clarify?

25           THE COURT:  Let's do.

```
 1              MR. NEWMAN:  I'm certainly not accusing
 2   Mr. Cameron of knowingly misrepresenting anything.  What I
 3   said is the facts that he describes in large part are false,
 4   and I'm not imputing motive.  I'm just saying they're false.
 5   I know they're false because I've worked for this client for
 6   a long time.
 7              THE COURT:  How about incorrect?
 8              MR. NEWMAN:  Incorrect, Your Honor, and I regret
 9   any misunderstanding.
10              THE COURT:  Let's say just incorrect.  That's a
11   better word.
12              MR. CAMERON:  May I address one point?  This is
13   logistical --
14              THE COURT:  Yes, you may.
15              MR. CAMERON:  -- forward thinking, and I know
16   we'll schedule an injunction hearing.  There was issue made
17   in the briefing that we haven't produced the e-mails.  We
18   have those and we'll send them to opposing counsel today.
19   But we need to find a way to produce those to the Court that
20   will not bury the Court's system.  We cannot electronically
21   file 65,000 e-mails.  That's a couple hundred thousand
22   pages.
23              THE COURT:  How are you going to give them?
24              MR. CAMERON:  What we propose, and this is what
25   we've done in many situations before, is we take the raw
```

1   e-mail file, which is the original, it's the best evidence,

2   it's not a paper copy, it's not a printout, it's exactly how

3   it was received, and we host that on one of our servers and

4   provide a link for them to download it.  It's approximately

5   two gigs of data, which isn't significant.  They can then

6   download those raw e-mails and they can view them in any

7   e-mail browser that they want to use.  We can provide those

8   raw e-mails on a data DVD to the Court so that they're here.

9   I believe that will probably be the best.  And certainly

10  with Judge Nuffer that's what we did.

11          THE COURT:  If you did it with Judge Nuffer, well,

12  anything Judge Nuffer can do, I also can do.  What I just

13  want to know, though, is my only concern would have been are

14  we capable with our capacities, and if we are, if Judge

15  Nuffer was able to access it, I can do the same because I

16  use the same stuff.

17          MR. NEWMAN:  Your Honor, if we come to this

18  agreement, there's no need for a preliminary injunction

19  hearing.  What that would involve is hours and hours and

20  hours and hours of attorney and staff time to argue whether

21  there should be an order about something that's already been

22  agreed upon which there's been no violation.  If there's a

23  violation, than perhaps they bring their motion for a

24  preliminary injunction.  But short of a violation, this

25  agreement should resolve the issue.

1          THE COURT:  It depends on what you agree.  Are you
2     saying this is in perpetuity?
3          MR. NEWMAN:  Yes, because that's how the
4     suppression list works in any regard.
5          THE COURT:  What do you think about that?
6          MR. CAMERON:  Your Honor, I believe we have
7     damages with respect to the e-mails that have already been
8     sent, nonstatutory, that need to be addressed.  I think
9     there are other evidentiary questions that are best resolved
10    through a preliminary injunction hearing.
11         THE COURT:  Why a preliminary injunction hearing
12    if we have a trial?
13         MR. CAMERON:  That's a good question, Your Honor.
14         THE COURT:  Think that over too, because I usually
15    don't award money, although I certainly have.
16         MR. CAMERON:  Which we wouldn't be requesting.
17    I'm merely discussing the damage.  Frankly, the irreparable
18    harm, that needs to be addressed.
19         THE COURT:  Your irreparable harm would be
20    rectified by my stopping it.  Money comes up in a trial.
21         MR. SCHMUTZ:  Your Honor, I think if the language
22    and the scope of this stipulated order would track the scope
23    of a preliminary injunction, if that's what's being
24    suggested by Mr. Newman, we can work on that, if it would
25    last through the pendency of the trial.

1          THE COURT:  If you could reach something with or

2     without my help that will last until the issues are resolved

3     at trial, then you're right.

4          MR. SCHMUTZ:  We're fine with that.

5          THE COURT:  So try and go to work.  You know how

6     to reach me.

7          MR. CAMERON:  I'm not sure we do.  Do we have the

8     best phone number to call and let the Court know?

9          THE COURT:  Do you want that to be you, Anne?

10         Ms. Rice will give you her number.

11         MR. SCHMUTZ:  Your Honor, may I say one more thing

12    just to advise the Court?  I have a hearing in Provo at two

13    and I may not be here when you return.  I just want you to

14    know that is the reason.

15         THE COURT:  Hopefully I'm not going to return.

16    Hopefully I just sign something in my office.  Okay.  But

17    we'll see.

18         Now I want you to please give it your best shot,

19    best effort, all of that.  If not, we'll be back here later

20    this afternoon and tomorrow, if necessary.

21         We'll be in recess.

22         (Whereupon, the proceeding was concluded.)

23

24

25

1                        C E R T I F I C A T E

2

3

4            I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 6-11-15
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25