Jill L. Dunyon (5948)
Maralyn M. English (8468)
SNOW, CHRISTENSEN & MARTINEAU
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145
(801) 521-9000
jld@scmlaw.com

Derek A. Newman (Pro Hac Vice)
Jake Bernstein (Pro Hac Vice)
NEWMAN DU WORS
2101 Fourth Avenue,
Suite 1500
Seattle, WA 98121
(206) 274-2800
dn@newmanlaw.com

Attorneys for Adknowledge, Inc.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>     Plaintiff,<br><br>v.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>     Defendants. | Case No. 2:15-CV-277 TC DBP<br><br>**DEFENDANT ADKNOWLEDGE, INC.'S MEMORANDUM IN OPPOSITION TO XMISSION'S MOTION TO COMPEL DISCOVERY**<br><br>Magistrate Judge Dustin B. Pead |

## I.     INTRODUCTION

XMission, L.C. requests four items: (1) identification of the Advertiser for each email at issue, (2) affirmative-consent evidence, (3) all Adknowledge tracking domain names since 2010, and (4) for Adknowledge to manually review 5,000 emails. The Court should deny the motion. The items requested by XMission do not exist now in Adknowledge's custody, and either cannot be obtained or would be too burdensome and expensive to create.

First, there is no Advertiser for each email at issue. No particular Advertiser was associated with any particular email when it was sent. Until an email is opened, no Advertiser is associated with the email. Since XMission—and not its customers—collected the emails at issue in this case and only opened 6.5% of them, no Advertiser was ever generated for 93.5% of the emails at issue. Also, the identity of any Advertiser is irrelevant because whether an Advertiser exists, or who an Advertiser is, is not germane to liability or damages.

Second, because Adknowledge does not send any email, it need not and does not maintain evidence of affirmative consent. Rather, the Publishers sent the emails and have that information. If Adknowledge obtains the affirmative-consent documents from the Publishers, Adknowledge will produce the evidence to XMission.

Third, XMission already has the tracking domain names—they are included in the emails that XMission produced. Any additional tracking domain names would be irrelevant. And XMission's request for all tracking domain names since 2010 is unreasonable because all emails in this case were sent in 2015.

Fourth, the cost of reviewing the remaining 5,000 emails outweighs the utility. Adknowledge already reviewed more than 95% of the emails at issue. The remaining 5% will not change whether liability exists or the amount of damages.

The Court should deny the motion to compel, or alternatively (i) give Adknowledge time to request information from third parties, and (ii) require XMission to bear the cost of reviewing the remaining 5,000 emails.

## II. FACTS RELATING TO XMISSION'S MOTION

1. Advertisers wish to promote their product websites on the Internet. Declaration of Matt Hoggatt ("Hoggatt Decl."), ¶ 2.

2. Publishers make content available for Internet users and generate revenue by displaying advertisements to the users. Publishers send email to recipients who agreed to receive the email. Publishers can include advertisements in email. *Id.* at ¶ 3.

3. Advertisers and Publishers do not necessarily have relationships. So Adknowledge connects Advertisers to Publishers through its email platform systems, collectively known as "AdStation." *Id.* at ¶ 4.

4. Advertisers load advertisements into AdStation. *Id.* at ¶ 5.

5. Publishers request advertisements from AdStation. *Id.* at ¶ 6.

6. When an email recipient clicks on a link in the email that the Publisher sent, the recipient is directed to the Advertiser's website. *Id.* at ¶ 7.

7. The Publisher is paid a fee for directing the recipient to the Advertiser's website. *Id.* at ¶ 8.

8. Before gaining access to AdStation, a Publisher must enter into Adknowledge's Publisher Agreement. Under the Agreement, the Publisher represents and warrants that it has affirmative consent from every one of its email recipients. *Id.* at ¶ 9.

9. Under its Agreement with the Publisher, Adknowledge promises not to disclose the Publisher's confidential information. *Id.* at ¶ 10.

10. Publishers—and not Adknowledge—sent all emails at issue in this case. The Publisher alone determines when, and to whom, to send emails. *Id.* at ¶ 11.

11. Advertisers place advertisements in Adknowledge's AdStation based upon a product category. For example, "Acme Insurance," a hypothetical auto-insurance provider, can place an advertisement into AdStation under the auto-insurance category. *Id.* at ¶ 12.

12. An email Publisher sends emails to recipients who agreed to receive email. The emails have a subject-line and sometimes a from-line identifying a product category. Using the auto-insurance example, a Publisher may send an email with a subject-line that says "Subject: Get lower cost auto insurance." *Id.* at ¶ 13.

13. If the product category interests the email recipient, the recipient can open the email. If the recipient opens the email—but not until the recipient opens the email—computer code in the email will request an advertisement from AdStation corresponding to the product category. Acme Insurance may be the Advertiser for an auto-insurance product category. But the Advertiser may be another auto-insurance provider. And if the email recipient opens the same email on three different occasions, the recipient may see three different advertisements from three different Advertisers. *Id.* at ¶ 14.

14. So until and unless the recipient opens the email, the email itself is advertiser-agnostic. No particular Advertiser or advertisement is associated with any particular email when it is sent. For that reason, Adknowledge cannot identify a specific single Advertiser or advertisement for any particular sent email at issue in this case. *Id.* at ¶ 15.

15. Adknowledge reviewed about 105,000 emails at issue in this case. About 93.5% of those emails were never opened. Rather, XMission collected emails automatically for purposes of this litigation without ever opening them. Accordingly, only 6.5% of the 105,000 reviewed emails at issue in this case were ever linked to an Advertiser. *Id.* at ¶ 16.

16. After the recipient opens the email, the Publisher's tracking domain name will identify to Adknowledge's system that the Publisher is requesting an advertisement. *Id.* at ¶ 17.

17. The recipient can click on the link in the Publisher's email. If the recipient clicks, the Publisher's tracking domain name will first direct the recipient through Adknowledge's system, where Adknowledge will track the click. Then Adknowledge will route the recipient to the Advertiser. *Id.* at ¶ 18.

18. Adknowledge directs the email recipient and identifies the Publisher based on the Publisher's tracking domain name. *Id.* at ¶ 19.

19. The Advertiser pays Adknowledge after the email recipient is directed to the Advertiser's website. Adknowledge retains a commission like an advertising agency traditionally would. And Adknowledge pays the balance to the Publisher. *Id.* at ¶ 20.

20. The tracking domain is registered to the Publisher. The Publisher—not Adknowledge—controls the tracking domain. *Id.* at ¶ 21.

21. The tracking domain is included in each email because the tracking domain is part of the link that the recipient clicks to access the Advertiser's website. *Id.* at ¶ 22.

22. XMission already has each tracking domain name for each email at issue in this case because it has all the emails, and each email contains the tracking domain name. *Id.* at ¶ 23.

23. XMission identified approximately 110,000 emails in this case. Of those, Adknowledge was able to review and analyze approximately 105,000 emails by an automated computer script. Adknowledge was unable to review the remaining approximate 5,000 emails by computer script—less than five percent of the total emails at issue in this case. *Id.* at ¶ 24.

24. Manually analyzing each email would take between 15 and 25 minutes. Specifically, for each email, a reviewer must find and record the following: from-name, from-address, from-domain, to-name, to-address, to-domain, subject line, time and date sent, time and date received, all "click links," the MD5 hash value, a request ID, the publisher ID, the publisher name, the product ID, the product name, the category ID, the category name and then must decode and record the previously located click links. In total, reviewing 5,000 emails manually would require between 1,250 and 2,100 man-hours. At $25 per hour, the review would cost up to $53,000.

### III.   DISCUSSION

**A.   Adknowledge cannot identify the Advertisers because no particular Advertiser is associated with any single email when it is sent—so the Court should deny the motion as to Interrogatory No. 1.**

XMission asks Adknowledge to identify "the Advertiser and the Publisher for each e-mail at issue in this lawsuit." But no Advertiser was associated with any email when the email was sent. Rather, an Advertiser is *only* connected with an email if the recipient opens or clicks the link in the email that the Publisher sends.  If the recipient does not open the email, no Advertiser will ever be associated with that email. Since XMission—and not its customers--collected the emails at issue in this case and only opened 6.5% of them, no Advertiser was ever connected to 93.5% of the emails at issue.

But the Advertiser is also irrelevant to any issue in this case. Liability and damages will not change based upon whether an Advertiser exists or who an Advertiser is. The Publisher sent the emails—not Adknowledge or any Advertiser.

The emails sent by the Publishers contain no advertiser-specific information. So Adknowledge cannot "identify the Advertiser…for each e-mail at issue." Nor would the identity of any Advertiser help to resolve any issue in this case. For those reasons, the Court should deny XMission's motion to compel a response to Interrogatory No. 1.

**B.   Adknowledge identified each Publisher by name and will disclose the Publisher contact information if XMission can show any email violated CAN-SPAM—so the Court should deny the motion as to Interrogatory No. 1.**

Adknowledge provided XMission with a list of each Publisher that sent the emails at issue in this case, together with Adknowledge's Agreement with those Publishers. Adknowledge redacted the Publishers' addresses because of confidentiality obligations in the Publisher Agreements. Adknowledge's relationships with Publishers will likely be disrupted if XMission contacts the Publishers.

If the Court is inclined to order Adknowledge to produce Publisher contact information, Adknowledge respectfully suggests that the Court bifurcate discovery. The first part of discovery

would determine whether any email at issue in this case violates CAN-SPAM. If, and only if, the Court determines that any email violates CAN-SPAM, then the second part of discovery would allow XMission to contact each Publisher. If no email violates CAN-SPAM, XMission should not be allowed to contact the Publishers.

C. **XMission already has the tracking domain names for all emails at issue in this case—so the Court should deny the motion as to Interrogatory No. 3.**

XMission asks for a list of every Adknowledge tracking domain name since 2010. Adknowledge does not have a list of tracking domain names. And the tracking domain names for the emails at issue in this case are included in the emails that XMission has. The tracking domain names are provided by the Publisher—and not Adknowledge.

Even if Adknowledge's tracking domain names for emails not at issue in this lawsuit were relevant, the time period XMission seeks is unreasonable. All emails at issue in this case were sent this year—2015. Tracking domain names used in 2010 do not relate to emails sent in 2015. The only tracking domain names that relate to this case are in the emails that XMission already has. Those tracking domain names were only used in 2015. Tracking domain names used for other emails, or in prior years, do not relate to this case and would not aid in resolving this matter. For that reason, the Court should deny XMission's motion to compel Interrogatory No. 3 requesting that Adknowledge identify every "tracking Domain Name used to track e-mails sent with Adknowledge-placed advertisements" since 2010.

D. **Adknowledge is not required to, and does not, maintain affirmative-consent records—so the Court should deny the motion as to Request For Production No. 6.**

XMission's Request for Production No. 6 seeks "all evidence of Affirmative Consent to receive the e-mails in question by each of the e-mail recipients of the e-mails at issue in this lawsuit." Adknowledge does not maintain records of Affirmative Consent for the emails at issue in this case because Adknowledge does not have a relationship with email recipients and did not send any email.

7

XMission argues that "Adknowledge must have its own evidence of Affirmative Consent." But CAN-SPAM does not require evidence of Affirmative Consent, except as an affirmative defense to violations of 15 U.S.C. § 7704(a)(4), (a)(5), and (d)(1). XMission does not sue Adknowledge under those sections. Second, Adknowledge did not send any of the emails at issue in this lawsuit—only the Publishers sent emails. And the Publishers' Agreements with Adknowledge require them to collect and maintain evidence of Affirmative Consent.

Adknowledge's Publisher Agreements allow Adknowledge to request the Affirmative Consent from the Publisher. Though Adknowledge can *request* the Affirmative Consent evidence from the Publishers, the *production* creates a substantial burden for the Publishers. XMission claims 110,000 emails violated the statute. That would require the Publishers to pull 110,000 records—a major undertaking by third parties.

If Adknowledge requests the Affirmative Consent from the Publishers at issue in this lawsuit, it will produce those records to XMission. Unless Adknowledge decides to request that information, the Court should not require Adknowledge to produce records that it does not currently have. If the Court requires Adknowledge to make the request, Adknowledge asks that it be given four months to request, compile, and produce the Affirmative Consent evidence.

The Court should deny XMission's motion to compel a response to Request for Production No. 6 because Adknowledge does not maintain the Affirmative Consent documents, is under no legal obligation to maintain them, and should not have to produce those records unless Adknowledge decides to obtain them.

E.  **The burden to review the remaining less-than-five percent of emails outweighs the utility—so the Court should deny the motion as to the general objection and responses.**

XMission requests that Adknowledge provide answers to its discovery requests with respect to the approximately 5,000 emails that Adknowledge was unable to automatically parse.[1] The $53,000 cost of manual review outweighs its likely benefit. Adknowledge successfully analyzed over 105,000 emails to date, representing over 95% of the emails at issue in this lawsuit. The unparsed emails are unlikely to be materially different from the analyzed emails and will not affect the legal analysis.

If XMission insists on a manual analysis, XMission should bear the cost. Adknowledge would hire contractors, and XMission should pay for those contractors. But since the burden and cost of the review outweighs the utility, the Court should deny XMission's motion to compel. Alternatively, the Court should require XMission to bear the cost of the review.

F.  **The court should deny discovery sanctions because Adknowledge has not violated any order.**

XMission asks this Court for an order "designating the fact that Adknowledge is a 'procurer' of the e-mails at issue in this lawsuit be taken as established for purposes of the action" and that the fact-finder assume as true that no email recipient gave affirmative consent. (Motion at ¶¶ 1-2.) XMission's request for relief is an extreme discovery sanction that would relieve XMission of its burden to prove its claims, tantamount to a partial summary-judgment order or a directed verdict. *See SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, No. 2:03 CV 294 DAK, 2005 WL 318784, at *7 (D. Utah Feb. 9, 2005). XMission's request for sanctions is premature. If XMission is entitled to any order at all, XMission's relief is limited to an order compelling production and responses.

---

[1] In this context, "parse" means to decode, deconstruct, and break apart an email into its component pieces for analysis. Adknowledge created a computerized tool to automatically parse emails. This tool worked for approximately 105,000 of the 110,000 emails at issue in this lawsuit. Adknowledge already produced the information resulting from this analysis.

Fed.R.Civ.P. 37(a)(1) governs XMission's motion and provides that XMission may only seek "an order compelling disclosure or discovery." Rule 37(b)(2) governs remedies, and provides that if Adknowledge "fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders."

A finding that Adknowledge has willfully disobeyed a court order is a prerequisite to sanctions. *See, e.g., SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, No. 2:03 CV 294 DAK, 2005 WL 318784, at *7 (D. Utah Feb. 9, 2005). And even if XMission can at a future date prove that an order was violated, the Court must still balance a variety of factors, including harm, willfulness, and the availability of lesser sanctions. *Id.* The Court should deny XMission's request for severe discovery sanctions because Adknowledge did not violate any order.

## IV.   CONCLUSION

XMission served burdensome discovery requests on Adknowledge, and Adknowledge substantially complied. The Court should not order the remaining four items. Since XMission collected emails for litigation and did not open them, 93.5% of the emails at issue were never connected to an Advertiser. And no Advertiser was associated with any email when it was sent. Adknowledge is not required to, and does not, maintain the affirmative-consent evidence. XMission already has the tracking domain names. And the cost to manually review the remaining 5% of emails far outweighs any benefit from a review. The Court should deny the motion to compel, or give Adknowledge time to request information from third parties and require XMission to bear the cost of the manual email review.

Respectfully submitted this 19th day of November, 2015.

**SNOW, CHRISTENSEN & MARTINEAU**

By: /s/ Maralyn M. English
Maralyn M. English
Jill L. Dunyon
*Attorneys for Adknowledge, Inc.*

**NEWMAN DU WORS LLP**

By: /s/ Derek A. Newman
Derek A. Newman, *pro hac vice*
Jason E. Bernstein, *pro hac vice*
*Attorneys for Adknowledge, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2015, I electronically filed the foregoing **DEFENDANT ADKNOWLEDGE, INC.'S MEMORANDUM IN OPPOSITION TO XMISSION'S MOTION TO COMPEL DISCOVERY** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive service.

/s/Derek Newman

3218072.1