Jill L. Dunyon (5948)
Maralyn M. English (8468)
Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145
(801) 521-9000
jld@scmlaw.com

Derek A. Newman (Pro Hac Vice)
Jake Bernstein (Pro Hac Vice)
Newman Du Wors
2101 Fourth Avenue,
Suite 1500
Seattle, WA 98121
(206) 274-2800
dn@newmanlaw.com

Attorneys for Adknowledge, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>    Plaintiff,<br><br>v.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>    Defendants. | Case No. 2:15-CV-277 TC DBP<br><br>**DECLARATION OF MATT HOGGATT**<br><br>Magistrate Judge Dustin B. Pead |

I, Matt Hoggatt, being first duly sworn and having personal knowledge of the matters asserted herein, do hereby declare as follows:

1. I am the General Manager responsible for Adknowledge's email business, branded "AdStation."

2. Advertisers wish to promote their product websites on the Internet.

3. Publishers make content available for Internet users and generate revenue by displaying advertisements to the users. Publishers send email to recipients who agreed to receive the email. Publishers can include advertisements in email.

4. Advertisers and Publishers do not necessarily have relationships with each other. So Adknowledge connects Advertisers to Publishers through its email platform systems, collectively known as "AdStation."

5. Advertisers load advertisements into AdStation.

6. Publishers request advertisements from AdStation.

7. When an email recipient clicks on a link in the email that the Publisher sent, the recipient is directed to the Advertiser's website.

8. The Publisher is paid a fee for directing the recipient to the Advertiser's website.

9. Before gaining access to AdStation, a Publisher must enter into Adknowledge's Publisher Agreement. Under the Agreement, the Publisher represents and warrants that it has express consent from every one of its email recipients.

10. Under its Agreement with the Publisher, Adknowledge promises not to disclose the Publisher's confidential information.

11. Publishers—and not Adknowledge—sent all emails at issue in this case. The Publisher alone determines when, and to whom, to send emails. At no time is the email recipient's actual email address provided to Adknowledge by the Publisher.

12. Advertisers place advertisements in Adknowledge's AdStation based upon a product category. For example, "Acme Insurance," a hypothetical auto-insurance provider, can place an advertisement into AdStation under the auto-insurance category.

13. An email Publisher sends emails to recipients who agreed to receive email. The emails have a subject-line. Using the auto-insurance example, a Publisher may send an email with a subject-line that says "Subject: Get lower cost auto insurance."

14. If the product category interests the email recipient, the recipient can open the email. If the recipient opens the email—but not until the recipient opens the email—computer code in the email will request an advertisement from AdStation corresponding to the product category. Acme Insurance may be the Advertiser for an auto-insurance product category. But the Advertiser may be another auto-insurance provider. And if the email recipient opens the same email on three different occasions, the recipient may see three different advertisements from three different Advertisers.

15. So until and unless the recipient opens the email, the email itself is advertiser-agnostic. No particular Advertiser or advertisement is associated with any particular email when it is sent. For that reason, Adknowledge cannot identify a specific single Advertiser or advertisement for any particular sent email at issue in this case.

16. Adknowledge reviewed about 105,000 emails at issue in this case. 93.5% of those emails were never opened. Rather, XMission collected emails automatically for purposes of this litigation without ever opening them. Accordingly, only 6.57% of the 105,000 reviewed emails at issue in this case were ever linked to an Advertiser.

17. After the recipient opens the email, the Publisher's tracking domain name will identify to Adknowledge's system that the Publisher is requesting an advertisement.

18. The recipient can click on the advertisement in the Publisher's email. If the recipient clicks, the Publisher's tracking domain name will first direct the recipient through

Adknowledge's system, where Adknowledge will track the click. Then Adknowledge will route the recipient to the Advertiser.

19. Adknowledge directs the email recipient and identifies the Publisher based on the Publisher's tracking domain name.

20. The Advertiser pays Adknowledge after the email recipient is directed to the Advertiser's website. Adknowledge retains a commission like an advertising agency traditionally would. And Adknowledge pays the balance to the Publisher.

21. The tracking domain is registered to the Publisher. The Publisher—not Adknowledge—controls the tracking domain.

22. The tracking domain is included in each email because the tracking domain is part of the link that the recipient clicks to access the Advertiser's website.

23. XMission already has each tracking domain name for each email at issue in this case because it has all the emails, and each email contains the tracking domain name.

24. XMission identified 110,000 emails in this case. Of those, Adknowledge was able to review and analyze 105,000 emails by an automated computer script. Adknowledge was unable to review the remaining approximate 5,000 emails by computer script—less than five percent of the total emails at issue in this case.

25. Manually analyzing each email takes between 15 and 25 minutes. Specifically, for each email, a reviewer must find and record the following: from-name, from-address, from-domain, to-name, to-address, to-domain, subject line, time and date sent, time and date received, all "click links," the MD5 hash value, a request ID, the publisher ID, the publisher name, the product ID, the product name, the category ID, the category name and then must decode and record the previously located click links. In total, reviewing 5,000 emails manually would require between 1,250 and 2,100 man-hours. At $25 per hour, the review would cost up to $53,000.

EXECUTED this 19th day of November, 2015.

_____
Matt Hoggatt