Maralyn M. English (8468)
Jill L. Dunyon (5948)
Snow Christensen & Martineau
10 Exchange Place, 11th Floor
P.O. Box 45000
Salt Lake City, UT 84145
Telephone: 801-521-9000
Facsimile:  801-363-0400
mme@scmlaw.com
jld@scmlaw.com

Derek A. Newman (*pro hac vice*)
Jason E. Bernstein (*pro hac vice*)
Newman Du Wors LLP
2101 Fourth Avenue, Ste. 1500
Seattle, WA 98121
Telephone: (206) 274-2800
dn@newmanlaw.com
jake@newmanlaw.com

*Attorneys for Adknowledge, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>Plaintiff,<br><br>vs.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>Defendants. | Case No. 2:15-cv-00277 TC DBP<br><br>**DECLARATION OF MATT HOGGATT IN SUPPORT OF DEFENDANT ADKNOWLEDGE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGEMENT**<br><br>**[REDACTED – ORIGINAL FILED UNDER SEAL]**<br><br>Judge Tena Campbell |

I, Matt Hoggatt, having personal knowledge of the matters asserted herein, do hereby declare as follows:

1.     I am the General Manager of Adknowledge's email business overseeing the List Management, API, and Partner Network solutions.

2.     My responsibilities include, among other things, managing Adknowledge's Compliance Department in connection with its AdStation email marketing platform. To clarify, AdStation refers to Adknowledge's email-based marketing business, while "AdStation Integrated" specifies the API-based email platform at issue in this case. I am familiar with Adknowledge's policies and procedures relating to compliance with federal and local laws, as well as guidelines established by Adknowledge or its advertiser clients.

**The AdStation Platform**

3.     AdStation connects advertisers to publishers. An "advertiser" is the party that seeks to generate awareness for and sales of its products and services. A "publisher" makes content available for Internet users.

4.     A publisher acquires email addresses from its users who agree to receive commercial email. Adknowledge requires all its publishers to obtain consent from potential recipients before sending any commercial email. But Adknowledge does not know who the consumers who receive information from publishers are, does not know their email addresses, or have any means to contact them unless they contact Adknowledge, or, as here, emails are provided to Adknowledge during litigation. This is because publishers closely guard their email lists and do not share them with third parties like Adknowledge. Instead, publishers only use

AdStation to access advertisements and directly send emails themselves, ensuring that neither Adknowledge nor any other person gets access to the email list. So Adknowledge requires all its publishers to obtain consent from potential recipients before sending any commercial email. For some publishers, guaranteeing the secrecy of the email list and not sharing it is a contractual obligation with consumers who only agree to provide their email address if it is not disseminated. Accordingly, for publishers using AdStation Integrated, Adknowledge does not ask for and publishers do not provide their email list, and Adknowledge never knows who receives emails containing advertisements drawn from AdStation unless a complaint is filed.

5.     Advertisers use publishers as a way to reach consumers. Advertisers load advertisements into AdStation. Publishers distribute the advertisements to their users.

6.     The AdStation platform is used by approximately 150 publishers and thousands of advertisers.

7.     Publishers request advertising campaigns and send emails to customers who opted-in to receive commercial content from those publishers.

8.     AdStation uses analytics to match publishers with advertising campaigns based on the publisher's user base.

9.     Adknowledge creates and supplies publishers with the "Creative" content, including the "Friendly From," the Subject line, and the email body. The "Subject" line contains a description of the email's content.

10.     When a publisher wants to send an email, it makes a request to AdStation for the "Friendly From", "Subject" line, and email body. The publisher's mail server combines this information with the recipient email address ("to" line), sender email address, and its footer.

11.     For AdStation Integrated, Advertisers pay Adknowledge only when a recipient opens the email and clicks on the link redirecting the recipient to the advertiser's website. Adknowledge is not paid merely for emails generated on its platform and sent by its publishers.

12.     Adknowledge does not advertise its own products or services in any emails generated with AdStation, including the emails at issue.

**Adknowledge's Compliance Practices**

13.     In connection with its operation of the AdStation platform, Adknowledge implements and enforces numerous policies and procedures to ensure compliance with federal and state laws relating to advertisements, commercial email, and the collection and sharing of personal information. Adknowledge has multiple full-time staff continuously at work to ensure that its network remains compliant.

14.     Before late 2014, Adknowledge tracked all compliance and violation data using shared Excel spreadsheets. Starting in late 2014, Adknowledge transitioned to a Salesforce database to track, manage, and record compliance and violation data.

15.     As part of its compliance efforts, Adknowledge has developed a 56-page internal compliance policies and procedures guide (the "Compliance Documentation") and a separate procedure document outlining Adknowledge's advertising/marketing content policies (the "General Marketing Guidelines"). Adknowledge actively revises these materials to reflect

updates to its compliance-related policies and procedures as needed, including when new regulations are enacted or when publisher or advertiser requirements need to be put in place. Copies of the most-current version of these documents are attached as Exhibits 1–2 to the Declaration of Jessie Sight ("Sight Decl.").

16.     Adknowledge also maintains tables of compliance information, including lists of violations and the appropriate action to take when those violations are discovered. A copy of the most-current Violation Matrix is attached as Exhibit 3 to the Sight Decl.

17.     Adknowledge produced hundreds of documents reflecting its robust compliance program to XMission as part of this litigation, including the Compliance Documentation, General Marketing Guidelines, compliance tables and matrices, and dozens of examples of enforcement emails sent to publishers.

18.     Adknowledge's proactive compliance efforts also include advance screening of email publishers before allowing them on the AdStation network. Adknowledge refers to this process as its "due diligence process."

19.     As a result of Adknowledge's methodical screening process, only an estimated 40 to 50% of the publishers asking to join the AdStation network are allowed to do so.

20.     Only after a publisher has met Adknowledge's criteria and passed the due-diligence review does Adknowledge allow the publisher to join the AdStation network. The publisher still must accept the terms and agree to Adknowledge's AdStation Integrated Agreement.

21.     All five publishers involved in sending the 32,111 emails at issue in XMission's motion for partial summary judgment signed Adknowledge's agreements. Attached as Exhibits 1–5 are true and correct copies of all contracts signed by the five relevant publishers.

22.     The AdStation Integrated Agreement reflects Adknowledge's policies and procedures to ensure, among other things, that its publishers represent and warrant their intent to remain compliant with laws regulating commercial email as a condition of their continued participation.

23.     For example, under the AdStation Integrated Agreement each publisher promises that it will not use AdStation to send commercial email to any recipient who has declined to receive additional email from the publisher. The AdStation Integrated Agreement uses the following language for compliance purposes:

> "Any commercial email sent by the Company pursuant to this Agreement shall: (1) only be sent to the Database, as defined herein; (2) not be transmitted to any recipient who has declined to receive additional Email from the list owner (after ten days elapsed from such declination); not use WHOIS Guard or a similar technology which masks the identity of a sender, in connection with its performance of this Agreement; (4) readily identify to a reasonable person, the list owner in the "from" line of each email sent in performance of this Agreement; (5) implement the Adknowledge footer template to advertise or promote Company's product, service, or internet web site in each email sent in performance of this Agreement sufficiently to qualify Company as a "sender" under the CAN-SPAM Act of 2003, 15 U.S.C. § 7702(16)(A); (6) include, unaltered by Company, the campaign and creative delivered by the Licensed Products, including without limitation the "subject" line and the "friendly from" line, all of which shall be sent by Company and returned via the Licensed Products; and (7) at all times comply with all applicable state and federal laws, rules, and regulations, including without limitation the CAN-SPAM Act and all rules and regulations thereunder, and if applicable, the Privacy and Electronic Communications (EC Directive) Regulations, as amended, as well as regulations governing U.S. export controls and federal election campaign contributions…

6

24.    Adknowledge requires publishers to promise that emails sent using AdStation will incorporate Adknowledge's email footer template, which requires accurate postal address information and a functional unsubscribe link that email recipients can use if they wish to stop receiving additional email (also called "opting out"). Adknowledge also recommends as a best practice that publishers use a postal address in the footer of the emails that matches the publisher's business registration address.

25.    Adknowledge requires publishers to agree that they will not use AdStation to send commercial email from an email address with a domain name that is privately registered.

26.    During the due diligence process, Adknowledge manually checks the WHOIS public database to confirm that the publisher's company domain name the publisher provided is not privately registered.

27.    Publishers typically use tens or hundreds of domain names to actually send email, which is neither illegal nor against Adknowledge's rules. There is no method to automatically verify each WHOIS entry. Checking WHOIS data must be done manually. There is currently no way to automatically review WHOIS records nor to verify physical addresses. Instead, in order to verify the WHOIS address for each domain name, Adknowledge would have to manually look up the WHOIS data for every domain name associated with each publisher and then physically visit the site of each reported address or obtain a certificate from the postmaster. So Adknowledge did not know, for example, that any of the WHOIS addresses associated with sender domains for the emails at issue did not correspond to actual physical addresses.

28.     Because it is commercially impossible for Adknowledge to verify WHOIS information for each and every domain name, Adknowledge requires its publishers to promise not to use private registration services when registering domain names.

29.     Adknowledge requires publishers to promise that they will not alter the campaign and creative provided by AdStation, including the email "subject" line and "friendly from" line, without Adknowledge's consent.

30.     Both the "friendly-from" names and the "subject lines" that Adknowledge creates accurately describe the advertisement product category so that recipients are put on notice immediately about the subject of the ad, avoiding any confusion about what the email's content.

31.     Adknowledge requires publishers at least once every seven days, to update their email distribution list with Adknowledge's global suppression list—which includes those email recipients who do not wish to receive additional emails from AdStation publishers.

32.     Adknowledge requires its publishers to promise that they will comply with all applicable state and federal laws, rules, and regulations governing privacy and the transmission of commercial email, including without limitation CAN-SPAM.

33.     The compliance representations and warranties included in the AdStation Integrated Agreement are non-negotiable, meaning that every publisher in the network must agree to these terms, including any revised versions of the terms as Adknowledge updates them from time to time, as a condition of their use and continued use of AdStation.

34.     The AdStation Integrated Agreement is revised as necessary to ensure that the publisher representations and warranties are consistent with Adknowledge's policies and procedures, as well as relevant law and regulations, including but not limited to CAN-SPAM.

35.     Even after a publisher is admitted to the AdStation network, Adknowledge receives updated lists from highly-respected third parties—including Spamhaus and ROKSO—containing publishers from whom accepting email is not recommended. Adknowledge's practice is to automatically suspend those publishers until the publisher presents evidence showing it was erroneously included on the blacklist.

36.     To ensure compliance with Adknowledge's Marketing Guidelines, the compliance team conducts regular audits of the content included in the advertising materials.

37.     Adknowledge also pays several third-party vendors to assist it with monitoring publishers and their compliance with Adknowledge's policies.

38.     One of the vendors Adknowledge uses to detect publisher compliance violations is Lashback. Lashback is a monitoring service that tracks actual emails sent by AdStation publishers and audits them.

39.     To do so, Lashback creates email addresses and signs up on publishers' email lists to receive emails. Lackback also has relationships with certain internet service providers that provide Lashback with emails sent by publishers in Adknowledge's network.

40.     Adknowledge implements specific rulesets in Lashback's system to flag emails that may be violating Adknowledge's policies. Adknowledge has Lashback flags emails if, for example, the "friendly from" line does not exactly match the "friendly from" line provided by

Adknowledge; the domain name in the "From Line" is privately registered; the message content is not on Adknowledge's approved list; the opt-out link is not hyperlinked; and the footer fails to include a postal address.

41.     Once these emails are flagged, Adknowledge's compliance team is able to investigate further to determine whether the publisher in fact violated Adknowledge's policies. On a daily basis, the compliance team reviews every email that Lashback flags to ensure compliance.

42.     In addition to Lashback, the compliance team learns about possible violations through complaints by consumers and Adknowledge's advertiser clients.

43.     Once the compliance team has confirmed the publisher has violated Adknowledge's policies, it records the violation in a Salesforce database. The Salesforce database allows Adknowledge to track violations on its network and identify repeat offenders so that it can penalize those offenders appropriately.

44.     On the Salesforce database, every violation is assigned a unique case ID. For each case ID, Adknowledge records the creation date, the associated publisher, and a brief description of the violation. The Salesforce database includes compliance history for every email publisher since the publisher first signed on the AdStation platform, including the five publishers at issue in this motion as described in Jessie Sight's declaration.

45.     Using the Salesforce database, the compliance team creates summary reports, which are referred to as Compliance Dashboards. The Compliance Dashboard summarizes the number of identified violations on the network, the type of violations, a list of publishers who were found to violate Adknowledge's policies, the number of violations associated with the

identified publishers, and the number of days it took the publisher to correct the issue, if applicable. Based on this data, the report includes a letter grade based on Adknowledge's compliance success. The grading system assigns more "points" to more serious violation types, with a higher total score equating to a lower letter grade.

46.     On a weekly basis, the compliance team distributes a Compliance Dashboard to the legal department and other AdStation executives. The Compliance Dashboard is used to identify repeat offenders. If repeat offenders are identified, the team discusses the appropriate penalty, including termination.

47.     On a monthly basis, the compliance team and management meet to discuss compliance issues, among other things. Prior to these monthly meetings, the compliance team circulates a Dashboard that summarizes reported violations for the month.

48.     Adknowledge sends every publisher found to violate its policies a notice. The notice informs the publisher of the violation and sets forth the corrective steps that the publisher must take to be compliant. Adknowledge requests that the publisher responds within 48 hours.

49.     Once a publisher receives a violation notice, it must implement the corrective action to avoid suspension.

50.     Depending on the severity of the violation, Adknowledge fines, suspends, or terminates offending publishers. Adknowledge maintains its Violation Matrix that describes possible violations and provides a range of appropriate enforcement actions. Because every publisher is different, the appropriate enforcement action depends on a publisher's violation history and the type of violation.

**XMission's Violation Notices and Adknowledge's Responses**

51.     As of the time that XMission filed its motion for partial summary judgment, it had sent Adknowledge seven "Violation Notices" under the Stipulated Order (Dkt. No. 17). XMission identified 3,572 emails in its Violation Notices.

52.     Adknowledge investigated every email identified in the Violation Notices and responded to each Violation Notice as required by the Stipulated Order. Attached to this Declaration as Exhibits 6–12 are Adknowledge's letters responding to each of XMission's seven violation notices.

53.     In its Motion for Partial Summary Judgment (Dkt. No. 53), XMission represents that 3,572 emails containing Adknowledge-placed advertisements were sent by Adknowledge's publishers after the Stipulated Order.

54.     The parties executed the Stipulated Order on May 5, 2015. The Stipulated Order required XMission to provide Adknowledge with a list of domains that Adknowledge would "block" from its platform. This list of domains is the "Add List." The Stipulated Order then required Adknowledge to add the "Add List" to its suppression list. A suppression list is a list of domains that publishers must not email.

55.     Adknowledge received the Add List on or about May 8, 2015. On the same day, Adknowledge sent a communication to its publishers asking them to download and apply a revised suppression list that included the domains identified by XMission in the Add List.

56.     Adknowledge's publisher contracts require every publisher to download and apply the suppression list at least every seven (7) days. The earliest date by which all of

Adknowledge's publishers could reasonably be expected to have downloaded and applied the revised suppression list is therefore May 15, 2015.

57.     During the 135-day period beginning January 1, 2015 and ending on May 15, 2015—which is the time period before Adknowledge used the Add List to revise its suppression list—XMission alleged that it received approximately 104,176 emails from Adknowledge publishers. Adknowledge publishers therefore allegedly sent an average of 771.67 emails per day to XMission domains.

58.     During the 305-day period beginning on May 15, 2015 and ending on March 14, 2016 (when XMission filed its motion for partial summary judgment), XMission received a *total* of 3,572 emails from Adknowledge publishers. After Adknowledge applied the Add List to its suppression list, Adknowledge publishers sent only 11.7 emails per day to XMission domains.

59.     By applying its suppression list, Adknowledge achieved a 98.5% reduction in commercial email sent to XMission domains from Adknowledge publishers.

60.     As part of the investigation required by the Stipulated Order, Adknowledge recorded the sent date of each and every email that XMission identified in its seven Violation Notices.

61.     Adknowledge also treated the Violation Notices as it would treat complaints and concerns raised by any other advertiser or consumer who contacts Adknowledge to report a potential violation. And though not required by the Stipulated Order, Adknowledge also instructed all publishers identified in Violation Notices to correct the relevant issues immediately to avoid fines, suspension, or termination.

62.     So after receiving XMission's first Violation Notice, Adknowledge took appropriate enforcement action against publishers who violated Adknowledge's compliance policies by sending emails to XMission domains in violation of the revised suppression list.

63.     Approximately fourteen (14) publishers sent the 3,572 emails identified in XMission's Violation Notices and therefore did not properly implement Adknowledge's updated global suppression list as required by their contractual obligations.

64.     Adknowledge's June 12 letter identified the five publishers who sent the emails between May 24 and June 7, 2015. A true and copy of the June 12, 2015 response to XMission's First Violation Notice is attached as Exhibit 6. Adknowledge instructed the five publishers to correct the issue immediately to avoid termination.

65.     Adknowledge's July 1 letter identified the seven publishers who sent the emails between May 24 and June 21, 2015. A true and copy of the July 1, 2015 response to XMission's Second Violation Notice is attached as Exhibit 7. Adknowledge spoke to each of the seven publishers and took corrective action, including terminating five of the publishers effective July 1.  As of July 1, these terminated publishers could no longer send—and did not send—any emails using Adknowledge's network.

66.     Adknowledge's August 10 letter identified the ten publishers who sent the emails between May 24 and July 26, 2015. A true and copy of the August 10, 2015 response to XMission's Third Violation Notice is attached as Exhibit 8. As of July 1, Adknowledge had already terminated four of the ten publishers—responsible for sending 273 of the 540 emails identified by XMission—before XMission sent its Third Violation Notice on August 4, 2015.

These 273 emails were sent before July 1, 2016, but XMission identified them for the first time

in its Third Violation Notice. Adknowledge spoke to the remaining six publishers and notified

them to update their distribution lists or correct any errors with suppression list implementation

to avoid termination.

67.     Adknowledge's September 23 letter identified 12 publishers who sent the emails

between May 24 and September 4, 2015. A true and copy of the September 23, 2015 response to

XMission's Fourth Violation Notice is attached as Exhibit 9. Adknowledge had terminated seven

of the 12 publishers—responsible for sending 200 of the 637 emails identified by XMission—

before XMission sent its Fourth Violation Notice on September 8, 2015. By the time

Adknowledge responded on September 23, 2015, another four publishers—responsible for 342

of the 637 emails—had been terminated. The remaining publisher had been warned on July 1,

2015, to correct its mistakes and sent just five emails afterwards, between July 2 and July 6,

2015.

68.     Adknowledge's October 15 letter identified the 11 publishers who sent the emails

between May 24 and October 12, 2015. A true and copy of the October 15, 2015 response to

XMission's Fifth Violation Notice is attached as Exhibit 10. Adknowledge had already

terminated ten of the 11 publishers—responsible for 488 of the 554 emails identified by

XMission—before XMission sent its Fifth Violation Notice.  The remaining publisher took

corrective action and sent no emails after July 6, 2015. None of the emails included in

XMission's Fifth Violation Notice were sent after September 4, 2015.

69.     Adknowledge's December 17 letter identified the 12 publishers who sent the emails between May 24 and December 14, 2015. A true and copy of the December 17, 2015 response to XMission's Sixth Violation Notice is attached as Exhibit 11. Adknowledge had already terminated ten of the 12 identified publishers—responsible for sending 629 of the 738 emails identified by XMission—before XMission sent its Sixth Violation Notice. Of the remaining emails, only two were sent after July 4, 2015 and Adknowledge's system could not parse one of those, meaning Adknowledge cannot verify that AdStation generated that email. Adknowledge spoke to the single publisher who sent an email after July 4, 2015, and notified them to update their distribution lists or correct any errors with suppression list implementation to avoid termination. That publisher never again sent another email to XMission.

70.     Adknowledge's February 11, 2016, letter identified eight publishers who sent 160 of the 209 emails between May 24 and September 4, 2015. A true and copy of the February 11, 2016 response to XMission's Seventh Violation Notice is attached as Exhibit 12. Adknowledge had previously terminated 6 of these eight publishers, none of whom sent any emails after September 4, 2015. The other publishers were responsible for just two emails, both sent before September 4, 2015. The remaining 49 emails were sent to domains that XMission had not included on its Add List for inclusion on Adknowledge's suppression list. Since XMission had not disclosed the domains, the Stipulated Order did not require Adknowledge to identify the publishers who sent those 49 emails.

71.     By way of further explanation, the SprintSender "family" of five related publishers sent 1,531 of the 3,572 emails identified by XMission. Adknowledge terminated the

16

five SprintSender publishers effective July 1, 2015. After July 1, the SprintSender publishers did not send a single email to XMission domains using Adknowledge's platform. Adknowledge's termination was 100% effective.

72. Similarly, Adknowledge terminated two other publishers—Kingston Web Consulting and Throughput (Arshad Khan)—for being listed on Spamhaus, effective August 20, 2015 and August 21, 2015 respectively. Though these publishers collectively sent only 30 of the 3,572 emails identified by XMission, a Spamhaus listing results in termination under Adknowledge's compliance policies.

73. Adknowledge does not terminate a publisher if the publisher, in Adknowledge's experience and judgment, makes innocent and correctable technical mistakes. For example, Squeeze Technology sent 766 emails before Adknowledge took corrective action, which occurred on July 1, 2015. After July 1, 2015, Squeeze Technology sent just five emails to XMission domains. Adknowledge will continue to monitor Squeeze Technology to ensure that it does not engage in a pattern or practice that violates CAN-SPAM.

74. Adknowledge terminated four other publishers effective September 15, 2015 due to continued violations of Adknowledge's compliance. These four publishers—Inter7 (Sangeeta Yadav), Salesily Standalone, Throughput (Zakir Khan), and Throughput (Ankit Singh)—sent 1,237 of the 3,572 emails identified by XMission.

75. Three publishers, including Squeeze Technology, who sent emails to XMission after May 15, 2015 remain active, responsible for just seven (7) emails after Adknowledge notified these publishers of compliance violations.

17

76.     Adknowledge's compliance policies are incredibly effective. As described above, Adknowledge achieved a better than 99.9% reduction in emails sent to XMission through a combination of its suppression lists and robust compliance policies and procedures.

77.     No consumer complained to Adknowledge about the emails at issue in this case. XMission did not notify Adknowledge of the emails at issue—or that XMission believed they violated CAN-SPAM—until after XMission sued.

Respectfully submitted this 29th day of July, 2016.

                            _____

                            Matt Hoggatt

76.     Adknowledge's compliance policies are incredibly effective. As described above, Adknowledge achieved a better than 99.9% reduction in emails sent to XMission through a combination of its suppression lists and robust compliance policies and procedures.

77.     No consumer complained to Adknowledge about the emails at issue in this case. XMission did not notify Adknowledge of the emails at issue—or that XMission believed they violated CAN-SPAM—until after XMission sued.

Respectfully submitted this 29th day of July, 2016.

Matt Hoggatt