Maralyn M. English (8468)
Jill L. Dunyon (5948)
Snow Christensen & Martineau
10 Exchange Place, 11th Floor
P.O. Box 45000
Salt Lake City, UT 84145
Telephone: 801-521-9000
Facsimile:  801-363-0400
mme@scmlaw.com
jld@scmlaw.com

Derek A. Newman *(pro hac vice)*
Jason E. Bernstein (*pro hac vice)*
Newman Du Wors LLP
2101 Fourth Avenue, Ste. 1500
Seattle, WA 98121
Telephone: (206) 274-2800
dn@newmanlaw.com
jake@newmanlaw.com

*Attorneys for Adknowledge, Inc.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>  Plaintiff,<br><br>  vs.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>  Defendants. | Case No. 2:15-cv-00277 TC DBP<br><br>**DECLARATION OF JESSIE SIGHT IN SUPPORT OF DEFENDANT ADKNOWLEDGE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[REDACTED – ORIGINAL FILED UNDER SEAL]**<br><br>Judge Tena Campbell |

I, Jessie Sight, having personal knowledge of the matters asserted herein, do hereby declare as follows:

1. I am employed by Defendant Adknowledge, Inc.'s ("Adknowledge") as its Compliance Manager.

2. I have been a member of Adknowledge's Compliance Department since early 2013.

3. Since early 2013, my responsibilities include managing Adknowledge's Compliance Department in connection with its AdStation email marketing platform.

4. My job requires me to be familiar with Adknowledge's practices, policies, and procedures to ensure compliance with federal, state, and international laws and regulations, as well as Adknowledge's guidelines related to commercial email.

5. In addition to managing the Compliance Department, I update Adknowledge's compliance policies as needed, including when new laws are enacted or when a publisher or advertiser changes its own policies; train Adknowledge employees in other business units on compliance rules; maintain Adknowledge's compliance databases and create compliance reports which I distribute to management to assist with business decisions; and enforce Adknowledge's practices, policies, and procedures against publishers.

6. As Compliance Manager, I use Adknowledge's compliance guidelines that I created and implemented using compliance concepts and procedures put in place before I joined

the company. I also update those documents as necessary and train other staff on compliance issues.

7. For example, as part of its compliance efforts, Adknowledge developed a 56-page internal compliance policies and procedures guide (the "Compliance Documentation") and a separate procedure document outlining Adknowledge's advertising/marketing content policies (the "General Marketing Guidelines"). Adknowledge actively revises these materials to reflect updates to its compliance-related policies and procedures as needed, including when new regulations are enacted or when publisher or advertiser requirements need to be put in place. I use these documents on a regular basis to perform my duties as Compliance Manager for AdStation. A true and correct copy of the most-current Compliance Documentation is attached hereto as Exhibit 1. A true and correct copy of the most-current General Marketing Guidelines is attached hereto as Exhibit 2.

8. In addition to the Compliance Documentation and General Marketing Guidelines, I also created a Violation Matrix, which lists possible violations and the appropriate responsive action. A true and correct copy of the most-current Violations Matrix is attached hereto as Exhibit 3.

9. Adknowledge performs due diligence checks (or "vetting") on every publisher requesting access to AdStation.

10. Before accepting a new publisher onto the AdStation network, I—or another employee—perform a due diligence investigation according to the processes laid out in the

3

Compliance Documentation. The vetting process includes, but isn't necessarily limited to, the following steps: (1) searching corporate records to verify that the company is in good standing; (2) searching a third party's database to ensure that the publisher does not appear on an email block list from which the third party does not recommend the acceptance of electronic mail; (3) reviewing the publisher's privacy policies to confirm that its users have consented to receive offers from third parties; (4) verifying that the publisher's unsubscribe and privacy policy URLs are active; (5) confirming that the publisher's email domain matches its website domain; and (6) conducting a general Internet search to look for anything suspicious relating to the publisher, such as complaints made to the Better Business Bureau or online consumer complaints.

11. Attached as Exhibits 4-8 are true and correct copies of the due diligence reports for each of the five publishers relevant to XMission's motion for partial summary judgment.

12. After the vetting process, a publisher must agree to and accept the AdStation Integrated Agreement.

13. The AdStation Integrated Agreement reflects Adknowledge's policies and procedures to ensure, among other things, that publishers represent and warrant their intent to remain compliant with laws regulating commercial email as a condition of their continued participation. Enforcing the terms and conditions in the AdStation Integrated Agreement is one of my primary duties as Compliance Manager.

14. To ensure compliance with Adknowledge's Marketing Guidelines, I lead the compliance team in auditing the content of advertising materials.

15. Adknowledge also pays several third-party vendors to assist it with monitoring publishers and their compliance with Adknowledge's policies. I regularly use the tools provided by these third-party vendors in conducting compliance audits and reviews of publishers.

16. For example, one of the vendors Adknowledge uses to detect publisher compliance violations is Lashback. Lashback is a monitoring service that tracks actual emails sent by AdStation publishers and audits them.

17. For approximately 18 months, I worked exclusively with Lashback on a day-to-day basis. Andrew Johnson now handles the day-to-day operation of Lashback. Andrew consults me when there are escalated issues.

18. To perform the monitoring service, Lashback creates email addresses and signs up on publishers' email lists to receive emails. Lackback also has relationships with certain Internet Service Providers that provide Lashback with emails sent by publishers in Adknowledge's network.

19. Adknowledge implements specific rulesets in LashBack's system to flag emails that may be violating Adknowledge's policies. Adknowledge has Lashback flag emails if, for example, the "friendly from" line does not exactly match the "friendly from" line provided by Adknowledge; the domain name in the "From Line" is privately registered; the message content is not on Adknowledge's approved list; the opt-out link is not hyperlinked; and the footer fails to include a postal address.

20. Once these emails are flagged, I and other members of the compliance department investigate further to determine whether the publisher in fact violated Adknowledge's policies. On

a daily basis, I and/or Andrew Johnson review every email that Lashback flags to ensure compliance. In addition to Lashback, I and/or Andrew Johnson learn about possible violations from complaints by consumers and Adknowledge's advertiser clients.

21. Once I confirm that a publisher violated Adknowledge's policies, I record that violation in a Salesforce database. The Salesforce database allows Adknowledge to track violations on its network and identify repeat offenders so that it can penalize those offenders appropriately.

22. On the Salesforce database, every violation is assigned a unique case ID. For each case ID, Adknowledge records the creation date, the associated publisher, and a brief description of the violation. The Salesforce database includes compliance history for every email publisher since the publisher first signed on the AdStation platform.

23. True and correct copies of Salesforce compliance histories for the five publishers relevant to XMission's motion for partial summary judgment are attached hereto as Exhibits 9-13.

24. Using the Salesforce database, I create summary reports, which are referred to as Compliance Dashboards. The Compliance Dashboard summarizes the number of identified violations on the network, the type of violations, a list of publishers who were found to violate Adknowledge's policies, and the number of days it took the publisher to correct the issue, if applicable. Based on this data, the report includes a letter grade of Adknowledge's compliance

efforts computed using a weighted grading system. The grading system assigns more "points" to more serious violation types with a higher total score equating to a lower letter grade.

25. A true and correct copy of a recently generated Compliance Dashboard is attached hereto as Exhibit 14.

26. On a weekly basis, I generate and distribute a Compliance Dashboard to the legal department and other AdStation executives. The Compliance Dashboard is used to identify repeat offenders. If repeat offenders are identified, the team discusses the appropriate penalty, including termination.

27. On a monthly basis, I, the compliance team, and management meet to discuss compliance issues. Before these monthly meetings, I circulate a Dashboard that summarizes reported violations for the month.

28. Adknowledge sends every publisher found to violate its policies a notice. The notice informs the publisher of the violation and sets forth the corrective steps that the publisher must take to be compliant. Adknowledge requests that the publisher respond within 48 hours. I have personally sent hundreds of these notices to publishers on the AdStation platform.

29. Once a publisher receives a violation notice, it must implement the corrective action to avoid suspension, fines, or termination.

30. Depending on the severity of the violation, Adknowledge fines, suspends, or terminates an offending publisher. Adknowledge maintains its Violation Matrix that describes possible violations and provides a range of appropriate enforcement actions. Because every

publisher is different, the appropriate enforcement action depends on a publisher's violation history and the type of violation. I work with Adknowledge's business managers to determine the appropriate enforcement action on a case-by-case basis using the Violation Matrix as a guide.

31. For example, for the period beginning July 1, 2014 and ending March 23, 2016, Adknowledge terminated 42 publishers. Ten publishers were terminated without any compliance violations, usually because they were identified on a third party's block like Spamhaus. Of the remaining 32 publishers, 21 were terminated after three or fewer violations.

32. Generally speaking, in my experience as Compliance Manager, publishers do not violate the same policy more than once or twice. The main exception is when a publisher inadvertently violates a policy due to a technical error, such as failing to have a working opt-out link because a server crashed or otherwise inadvertently went offline. Adknowledge's compliance program is designed to detect publishers who repeatedly violate the same policy and Adknowledge takes appropriate corrective action, which includes suspending, fining, and terminating repeat violators.

33. None of the emails at issue in this matter were flagged by Adknowledge or its compliance monitoring tools because no violations were detected.

Respectfully submitted this 28th day of June 2016.

_____
Jessie Sight

8