**Brady Brammer (13411)**
**SPAULDING LAW**
1909 W. State Rd., Suite 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
Fax: (801) 877-4318
bbrammer@spauldinglaw.com

**Attorneys for Tom Sanders**

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XMISSION, L.C., a Utah company,<br><br>Plaintiff,<br><br>vs.<br><br>ADKNOWLEDGE, INC. a Missouri Corporation; DOES 1-40,<br><br>Defendants. | **DECLARATION OF TOM SANDERS**<br><br>Case No.: 2:15cv00277 TC<br><br>Judge Tena Campbell |

I, Tom Sanders, do hereby declare and state as follows:

1. I am over the age of 18 and am competent to testify herein and make this statement based on my personal knowledge.

2. I am married to Mandee Sanders, whose maiden name is Mandee Henderson.

3. We were married in 2009.

4. Beginning or around 2009, I was a publisher with Adknowledge through the name Arovah Interactive.

5. In around February 2011, Adknowledge contacted me and indicated that my email addresses, name and IP Addresses had been flagged and blacklisted by Spamhaus, a spam prevention service, and that Adknowledge needed to shut down my publisher account.

6. At the time, I produced a lot of volume for Adknowledge, so they wanted me to keep publishing emails on their behalf.

7. Adknowledge told me to set up new accounts under different names in order to get around Spamhaus. It was my understanding that Adknowledge wanted to throw Spamhaus off of the scent.

8. Adknowledge told me to use my wife's maiden name, Mandee Henderson, so that it could not be tracked back to me, since my name was flagged.

9. Adknowledge employee Bill Intrater personally visited me in Utah. As part of his visit, he helped me set up new accounts, under the new name and evade Spamhaus and other blacklists.

10. Starting in February 2011, Adknowledge set up my new accounts under the publisher name, Mandee Henderson.

11. Mandee had not used the name Henderson, and was not known by that name since 2009.

12. My account had various other sub-affiliate accounts for which we received payment, including accounts set up under the names Red Ryder and GFuchs.

13. The accounts for Red Ryder and GFuchs were officially set up by other people, who were either my 1099 employees or who I knew personally.

14. Typically, publishers have a 2 to 3 day waiting period before they are approved in Adknowledge's system, but in my experience, if you know the right people at Adknowledge, you can set up a publisher account in an hour and without any questions other than your name and account information. In other words, the info Adknowledge needed to generate a 1099.

15. My perception was that Adknowledge's primary concern was with generating

email traffic, so if you can show Adknowledge that you can produce a lot of volume, that is all that mattered to them.

16. I was a good producer and despite having been blacklisted by Spamhaus, Adknowledge made it simple for me to simply sign up again under a different name and keep emailing.

17. Before we terminated our relationship with Adknowledge, Adknowledge had paid me between $300,000 and $400,000 in gross revenue between January 2009 and January 2015 for publishing commercial emails.

18. Adknowledge would pay for clicks, so the more emails I delivered, the more I was paid. Adknowledge was also paid for clicks, so the more emails I delivered, the more Adknowledge was paid.

19. My business address was always 1353 S Wild Horse Pt. Saratoga Springs, UT 84045.

20. Publishers provide email addresses to Adknowledge to which to send emails ("Recipient Addresses") and also provide the email addresses from which the emails are sent ("Sender Domains").

21. I acquired the Recipient Addresses that I used from other lead generators. I would either pay to purchase lists or would enter into a revenue sharing arrangement with the owners of the lists. I did not generate my own lists of email addresses and to my knowledge, neither did any other publishers.

22. Adknowledge never expressed concern with the source of email lists. Their attitude always was, the more the merrier.

23. Adknowledge placed no limit on the number of emails a publisher could send to a

single email address in any given day. This is part of what attracts publishers to Adknowledge. A publisher with a small list can sign up with Adknowledge and still send millions of emails. Other than providing a suppression list, Adknowledge did nothing to regulate this.

24. I acquired Sender Domains from which to send emails for Adknowledge.

25. I could not use, nor did I ever, use my actual business address when I acquired Sender Domains because it would be flagged and all emails from domains associated with my name or address would be blacklisted and never delivered.

26. In fact, my name was already blacklisted, so Adknowledge had me form a new account in my wife's maiden name.

27. If my domains were blacklisted, I would not deliver many emails and neither I nor Adknowledge would make any money.

28. Adknowledge instructed publishers to change the names and addresses that we used to register Sender Domains and provided for WHOIS records every 5 or 10 days. This would allow our domains to avoid getting flagged and blacklisted and would help to ensure better deliverability of emails.

29. Adknowledge told us to put whatever information we could in the domain registration to ensure registration of the domains and avoid blacklists.

30. It is very common for publishers to use fake names and addresses in registering domains to accomplish Adknowledge's purpose.

31. Adknowledge told us to always "keep things fresh" meaning change our names and addresses associated with registration on a regular basis.

32. Every domain that I registered I would submit to Adknowledge.

33. This is part of their system, because the emails are generated with a sender

domain.

34. To my knowledge, Adknowledge never verified that any registration information was accurate and, if they did, they never expressed any concern. Through their pay-per-click business model, Adknowledge incentivized us to obtain as many Sender Domains as possible through any means possible.

35. Adknowledge was content as long as we could continue to provide domains that would increase our chances of deliverability.

36. During my time as a publisher for Adknowledge, I would register a new Sender Domain name daily, nearly every day of the week.

37. Adknowledge instructed us to do this because new Sender Domains helped to ensure deliverability.

38. The only purpose for my registering the Sender Domains was to send email for Adknowledge. They had no other purpose.

39. Adknowledge never told us not to register Sender Domains with certain Registrars or to ensure that we comply with Registrar policies. Instead, Adknowledge encouraged us to obtain as many Sender Domains as possible, and did not express any concern about how we did it.

40. At Adknowledge's instruction, I would change my registration names and addresses frequently.

41. The message from Adknowledge always was to get emails delivered at any cost. The entire business model was purely revenue driven.

42. When I did what Adknowledge told me, like registering new domains frequently and using different names and addresses, my earning increased by three or four times. In turn,

Adknowledge's revenue also increased.

43. Adknowledge never cancelled any of the Mandee Henderson related accounts, or if they did, they never informed me.

44. Adknowledge never disciplined me for any reason, or if they did, they never informed me.

45. Adknowledge never notified me of any violations of any laws that existed in the emails sent through the Mandee Henderson accounts.

46. Once I was set up within Adknowledge's automated emailing system and generating clicks, I would never hear from Adknowledge other than occasional instruction on how to boost traffic.

47. I recently became aware of a document entitled "Adknowledge Compliance Documentation" which is attached hereto as Exhibit A.

48. Prior to my receiving this document in July 2016 from my attorney, I had never seen this document before.

49. Adknowledge never provided this to me.

50. Adknowledge never provided any training on this document to me.

51. I did not even know it existed.

52. I am generally familiar with the CAN-SPAM Act from my work that predated my publisher relationship with Adknowledge.

53. Adknowledge never once provided any training on the CAN-SPAM Act or compliance with the CAN-SPAM Act to me.

54. No one at Adknowledge ever asked me about the CAN-SPAM Act or asked me if I would comply with it. Adknowledge's focus always was revenue driven and their message

always was to deliver as many emails as possible.

55. Adknowledge never indicated that they had any sort of compliance requirements. They never trained me on it and I never heard a word about it. As stated before, once I was plugged into their system and making money, I never heard from them other than instruction from time to time on how to drive more traffic.

56. Because Adknowledge operates a pay-per-click model, the only way to make money is to deliver as many emails as possible. This was always the only goal that Adknowledge communicated.

57. Adknowledge largely controlled the content of the emails.

58. They provide the "from" name, subject line and body.

59. I would simply submit my Recipient Addresses and Sender Domains and Adknowledge's system would automatically generate all the emails and would then send them back to me.

60. I would also add my own opt-out links.

61. Those Adknowledge emails would be delivered electronically to my servers that would automatically send them out.

62. Everything is automated.

63. Adknowledge requires that the publishers host the domains and send the emails from our email servers because otherwise Adknowledge's domains and servers would be blacklisted.

64. The emails that Adknowledge generates automatically are essentially redirected through publisher servers in order to mask Adknowledge.

65. Adknowledge uses generic "from" names that change frequently because that

increases deliverability.

66. The publishers do not control the "from" names or have any say in what they are. We simply provide the Sender Domains and Recipient Email Addresses.

67. The Sender Domains are not related to the "from" names because Adknowledge sets those independently of what our Sender Domains are.

68. There were other commonly used techniques that publishers could control to ensure higher deliverability.

69. One example is where white dictionary-type text is copied and pasted into the emails. The text confuses spam filters because the emails appear to be relationship type message instead of commercial.

70. Adknowledge always rewarded higher deliverability with higher payments because more clicks equaled more money. Adknowledge never deterred this type of practice or even mentioned it.

71. If it was not for the prospect of getting paid by Adknowledge, I would never have sent out commercial emails through Adknowledge's system.

I declare under penalty of perjury of the laws of the state of Utah and the United States, that the foregoing is true and correct to the best of my knowledge.

Executed: August 16, 2016